JEFFERSON ISLAND SALT MINING CO. et al. v. UNITED STATES (INTERSTATE COMMERCE COMMISSION, Intervener).

(District Court, N. D. Ohio, E. D. May 28, 1925.)

No. 1419.

1. Commerce ☞88—Order of Commission fixing minimum rates on salt held not outside of pleadings.

Order of Interstate Commerce Commission, fixing minimum rates on salt from respective mines, *held* not outside of pleadings in proceedings had under Interstate Commerce Act, §§ 1, 2, 3 (Comp. St. §§ 8563–8565), and sections 13, 15, as amended, and 15a, as added by Transportation Act 1920 (Comp. St. Ann. Supp. 1923, §§ 8581, 8583, 8583a).

2. Commerce ☞85—Commission held authorized to increase minimum rate without finding that prior rate was noncompensatory or unreasonable for purpose of preventing discrimination between localities.

Under Interstate Commerce Act, §§ 1, 2, 3 (Comp. St. §§ 8563–8565), and sections 13, 15, as amended, and 15a, as added by Transp. Act 1920 (U. S. Comp. St. Ann. Supp. 1923, §§ 8581, 8583, and 8583a), Interstate Commerce Commission *held* authorized to increase minimum rate on salt from Detroit to Chicago, without finding that prior rate was noncompensatory or unreasonable, in order to relieve discrimination otherwise resulting adversely to mines located in New York, Kansas, and Louisiana, and carriers serving them, and for purpose of preventing any prejudicial discrimination between localities, particularly in view of provisions of section 15a for so-called recapture of excess earnings thus allowed.

3. Commerce ☞97—Though order of Commission invalid, unless supported by evidence, court cannot weigh testimony as to reasonableness of rates or wisdom in establishing them.

Though order of Interstate Commerce Commission is invalid, unless supported by evidence, reviewing court cannot weigh testimony as to reasonableness of rates or wisdom in establishing them, Commission's judgment as to such matters being final.

4. Carriers ☞26—Same tests and standards applicable for determination of just and reasonable minimum rate as for maximum rate.

No different tests or standards are prescribed for determination of just and reasonable minimum rate than for just and reasonable maximum rate.

5. Carriers ☞26—Matters which may be considered by Commission in fixing minimum rates stated.

In fixing minimum rates on specific commodity from different points of origin to common destination, Interstate Commerce Commission may consider going rates on same commodity in same or different territories, relation of rates to destinations, revenue per car mile and ton mile, variations in traffic density, and peculiarities in transportation which affect general transportation costs.

In Equity. Suit by the Jefferson Island Salt Mining Company and the Kyles Salt Company against the United States, wherein the Interstate Commerce Commission intervened. Bill dismissed.

Norman, Quirk & Graham, of Washington, D. C., J. V. Norman and W. W. Crawford, both of Louisville, Ky., Tolles, Hogsett, Ginn & Morley, of Cleveland, Ohio, and George F. Graham, of Louisville, Ky., for plaintiffs.

Blackburn Esterline, Asst. Sol. Gen., of Washington, D. C., for the United States.

Daniel W. Knowlton, of Washington, D. C. (P. J. Farrell, of Washington, D. C., of counsel), for Interstate Commerce Commission.

Before DONAHUE, Circuit Judge, and WESTENHAVER and JONES, District Judges.

WESTENHAVER, District Judge. This controversy involves the salt rate structure established by order of the Interstate Commerce Commission, entered October 14, 1924, and to become effective May 23, 1925. See Salt Cases of 1923, 92 I. C. C. 388. The plaintiffs bring this suit to enjoin and declare void the Commission's order, particularly as it fixes a minimum rate on salt from their respective mines in Louisiana, to Chicago, St. Louis, Indianapolis, Louisville, and Cincinnati. The case was heard before three judges, under Act Oct. 22, 1913, c. 32 (38 Stat. 220, U. S. Comp. St. § 998), on an application for a preliminary injunction, at the conclusion of which, by the consent of parties, the case was submitted as on final hearing for a decree on the merits. The full transcript of the proceedings before the Commission was introduced in evidence.

The several proceedings heard together, and in which the Commission's order was made, began as early as September, 1922. Various related aspects of the controversy had engaged the Commission's attention much earlier. See Salt from La. Mines to Chicago, Ill., St. Louis, Mo., and Intermediate Main Line Points, 66 I. C. C. 81; Id., 69 I. C. C. 312; Kansas Rock Salt Co. v. Atchison, Topeka & Santa Fé Railroad Co. et al., 69 I. C. C. 745. An investigation and suspension inquiry, involving aspects of the controversy, was heard with the proceeding now to be considered, and disposed of separately. See Salt from C. F. A. to Western Trunk Line Destinations and between Points C. F. A. Territory, 74 I. C. C. 409. The findings therein made are material to be considered in passing on the validity of the order now sought to be enjoined.

These several proceedings involve practically all producers, shippers, and interstate carriers of salt east of the Rocky Mountains. The opinions and orders of the Commission deal with rates as applied generally in this entire territory. In addition, commodity descriptions and carload minima were likewise considered and determined. The branch of the controversy, however, now before us, deals primarily with relationships between rates rather than the measure of rates. It will serve no useful purpose to state any facts, except such as are necessary to present plaintiffs' grounds of complaint in their aspect most favorable to them.

Salt is chiefly produced in certain fields located at and near Detroit, Mich., at and near Akron and Cleveland, Ohio, at and near Halite and Retsof, N. Y., at and near Kanopolis and neighboring points in Kansas, and at and near Jefferson Island and neighboring points in Louisiana. Chicago is the chief consuming market for salt, particularly rock salt, which is produced only at the Detroit, New York, Kansas, and Louisiana mines. The market price in Chicago largely determines the market price throughout the entire producing and selling territory. The rate structure in the past has been built up largely as a result of competitive efforts to get into the Chicago market, and the rate relationships prescribed in the order now attacked were established primarily with a view to a proper alignment of rates to that dominating point, and to prevent ruinous cut rate wars between carriers, and prejudicial discrimination between localities.

The rates will be stated in terms of 100 pounds, unless otherwise stated. The Commission's order prescribed a minimum rate of 13 cents from Detroit to Chicago, with a minimum carloading of 45,000 pounds. The previous rate from Detroit to Chicago was 11.5 cents on bulk salt, with a minimum carloading of 60,000 pounds, and 13 cents on package salt, with a minimum carloading of 37,500 pounds. The Commission's order prescribed a minimum rate from New York points to Chicago of not less than 21 cents, with a maximum not exceeding by 8 cents the corresponding rate contemporaneously maintained from Detroit to Chicago. The previous rate from Halite to Chicago was 19 cents, allowing a differential over Detroit to Chicago of 7.5 cents. The Commission prescribed a minimum rate from Kansas points to Chicago of not less than 24 cents, and a maximum rate which shall not exceed by more than 11 cents the corresponding rates contemporaneously maintained from Detroit to Chicago. The previous rate from Kansas to Chicago was 23.1 cents, allowing a differential over the previous bulk rate from Detroit to Chicago of 11.6 cents. The Commission prescribed a minimum rate from Louisiana points to Chicago of not less than 27 cents per 100 pounds, thereby creating a differential over the Detroit to Chicago rate of 14 cents. The previous rate from Louisiana to Chicago was 23.8 cents, allowing a differential over the previous bulk rate from Detroit to Chicago of 12.3 cents. It is this increase in the minimum rate and in the differential over the Detroit to Chicago rate that constitutes the plaintiffs' chief grievance. Complaint is also made of the new minimum rates to St. Louis, Indianapolis, Louisville, and Cincinnati; but, inasmuch as these changes are less disadvantageous to plaintiffs and were not stressed in argument, the details will not be stated nor separately considered.

Plaintiffs assail the validity of the Commission's order, particularly so far as it fixes the minimum rate from Detroit to Chicago and from the Louisiana mines to Chicago, on three grounds: (1) That the order is arbitrary and not justified by the pleadings; (2) that it is in excess of the statutory power of the Commission; and (3) that it is not sustained by substantial or any evidence. The argument is that the Commission first fixed the minimum Detroit to Chicago rate, and increased it over the previous rate without any finding that the previous rate was unreasonably low, and without that question having been put in issue; that, having done so, the Commission then used that minimum rate as a yardstick by which to measure the minimum rates from Louisiana and Kansas

and New York, and ordered an increase based at least in part on the rate thus unlawfully established. As to the Louisiana to Chicago rate, it is further urged that the carriers handling that traffic and collecting the rates did not participate with carriers serving New York, Ohio, Michigan, or Kansas, and that no finding was or could be made of undue prejudice between shippers or localities, in violation of Interstate Commerce Act, § 3 (Comp. St. § 8565); but notwithstanding the Commission, without any supporting evidence, found the rates from Louisiana to Chicago unreasonably low, in the face of evidence that they were not less than compensatory, in order to establish and carry out the Commission's own rate-making policy and to regulate competition between salt producers, rather than rates between carriers. This is the substance of plaintiffs' argument, as we understand it, and each of these contentions will be briefly considered.

1. The relation of the existing rate from Detroit to Chicago and its reasonableness with relation to other rates were specifically put in issue by the pleadings. That it was unreasonable, because either too low or too high, is also specifically made an issue in case 14106. See paragraphs 5 and 11 of complaint. That it was prejudicial and discriminatory as against the New York shippers, in violation of section 3, is also specifically put in issue by that complaint. Previously, the interstate carrier had made an effort to reduce the Detroit to Chicago rate to 10 cents, in order to meet a reduction made in the Kansas and the Louisiana rates to Chicago. On complaint that this new rate would be unreasonably low, and also prejudicial and discriminatory as against the New York and Ohio mines, it was suspended for investigation, and was heard, as already stated, together with case 14106, and was ordered canceled. See Salt from C. F. A. to Western Trunk Line Destinations and Between Points C. F. A. Territory, 74 I. C. C. 409. In cases 14157 and 14125, as well as in 14106, complaint is made that the Kansas and Louisiana rates to Chicago and other points are both unreasonably low and unduly prejudicial and discriminatory. In the first two cases, the specific relief sought is that proper and reasonable minimum rates from Louisiana and Kansas to Chicago shall be prescribed, and that reasonable maximum rates from Michigan, Ohio, and New York to Chicago shall be fixed. In 14106 the relief prayed for in part is that such other rates as the Commission may deem reasonable and just shall be fixed and put in force, and applied in the future, in lieu of the existing rates of which complaint is made.

[1] Plaintiffs' complaint that the Commission's order, both as to the rate from Detroit to Chicago, as well as from other points to Chicago, was outside of the pleadings, is found not to be sustained. The investigation and suspension inquiry (Salt from C. F. A. to Western Trunk Line Destinations and Between Points in C. F. A. Territory. 74 Interst. Com. Com'n R. 409) and the rate inquiry in the present combined proceeding were as broad as the pleadings and as extensive as the power conferred on the Commission by Interstate Commerce Act, §§ 1, 2, 3, and sections 13, 15, as amended and 15a, as added, by Transportation Act 1920. Plaintiffs, as well as all other interested parties, were fully advised of the scope of the inquiry and were accorded full opportunity to present all pertinent evidence. No one was surprised. The plaintiffs were present and participated from the beginning to the end of all inquiries. If any infirmity is to be found in the Commission's order, it is not in the limited range of the inquiry, but must be due to want of statutory power, or to a lack of substantial evidence to support the Commission's findings.

[2] 2. Plaintiffs' complaint most strongly stressed is that the Commission exceeded the power conferred on it by the Interstate Commerce Act. The argument is that, the existing Detroit to Chicago rate not being shown to be noncompensatory, nor in itself unreasonably low from the carrier's viewpoint, the Commission was without power to fix a higher minimum merely because the New York to Chicago rate was unreasonably low, and could not be raised without undue prejudice to the New York mines and the carriers serving them. A like argument is made concerning the Louisiana to Chicago rates. In addition, it is urged that, since undue prejudice or discrimination as between shippers and localities was and could not be found under section 3, the Commission's order was not a regulation of freight rates, but a regulation of competition between carriers and producers of salt, and a substitution of the Commission's own rate-making policy, with a view to the parceling out of markets.

In our opinion, these arguments are not sound. They adopt too restricted a view of the powers conferred on the Commission by the Interstate Commerce Act, particularly by the amendments thereto made in the Transportation Act of 1920. The enlarged power conferred by amended sections 13, 15,

and new 15a, is overlooked. Section 13 (4), being U. S. Comp. St. Ann. Supp. 1923, § 8581, confers power on the Commission to prescribe minimum as well as maximum rates, whenever it finds any existing rate causes any undue or unreasonable advantage, preference, or prejudice, or any undue or unreasonable discrimination as between persons or localities in intrastate commerce, on the one hand, and interstate or foreign commerce, on the other. Section 15 (1), being U. S. Comp. St. Ann. Supp. 1923, § 8583, empowers the Commission, whenever it finds that any existing rate is or will be unjust or unreasonable, or unjustly discriminatory, or unduly preferential or prejudicial, to prescribe what will be a just and reasonable rate to be observed in the future, or the maximum or minimum rate thereafter to be charged. By these sections the Commission is empowered to raise the rates, not merely because noncompensatory to the carrier receiving them, but because they are unjust or unreasonable from the point of view of other carriers and localities. New section 15a (2), being U. S. Comp. St. Ann. Supp. 1923, § 8583a, empowers the Commission to initiate, modify, establish, or adjust rates, so that carriers as a whole, or in rate groups or territories, will earn an annual aggregate net income sufficient to give a fair return upon the aggregate value of the carrier's property. This section also limits the earnings going to the carrier, contains provisions for the so-called recapture of excess earnings, and provides for relief to the weaker and less profitable railway systems.

These several amendments must be read in connection with sections 2 and 3 of the original Interstate Commerce Act (Comp. St. §§ 8564, 8565). The scope and purpose of these provisions have received consideration in the Supreme Court. The decided cases need not be reviewed in detail. In Dayton-Goose Creek Ry. Co. v. United States, 263 U. S. 456, 478, 44 S. Ct. 169, 68 L. Ed. 388, 32 A. L. R. 472, it is said: "The new act seeks affirmatively to build up a system of railways prepared to handle promptly all the interstate traffic of the country. It aims to give the owners of the railways an opportunity to earn enough to maintain their properties and equipment in such a state of efficiency that they can carry well this burden. To achieve this great purpose, it puts the railroad systems of the country more completely than ever under the fostering guardianship and control of the Commission, which is to supervise their issue of securities, their car supply and distribution, their

joint use of terminals, their construction of new lines, their abandonment of old lines, and by a proper division of joint rates, and by fixing adequate rates for interstate commerce, and in case of discrimination, for intrastate commerce, to secure a fair return upon the properties of the carriers engaged."

The argument was also made in that case that the power to regulate interstate commerce is limited to the fixing of reasonable rates and the prevention of discriminatory rates, and does not extend to the wider relationships necessary to grant relief such as is given by the Commission's order now being considered. Replying to this argument it is said: "This is too narrow a view of the commerce clause. To regulate in the sense intended is to foster, protect, and control the commerce with appropriate regard to the welfare of those who are immediately concerned, as well as the public at large, and to promote its growth and insure its safety." In United States v. Illinois Central R. Co., 263 U. S. 515, 525, 44 S. Ct. 189, 193, 68 L. Ed. 417, it is said: "For now the interests of the individual carrier must yield in many respects to the public need [cases cited]; and the newly conferred power to grant relief against rates unreasonably low may afford protection against injurious rate policies of a competitor, which were theretofore uncontrollable. The order of the Commission was not an attempt to establish its own policy of rate-making." See, also, Wisconsin Railroad Commission v. C., B. & Q. R. R. Co., 257 U. S. 563, 42 S. Ct. 232, 66 L. Ed. 371, 22 A. L. R. 1086; New England Divisions Case, 261 U. S. 184, 43 S. Ct. 270, 67 L. Ed. 605; Western Paper Makers' Chemical Co. v. United States, decided October 28, 1924, by Denison and Knappen, Circuit Judges, and Sessions, District Judge.

In the present case, the evidence is ample that ruinous rate wars can only be avoided and a reasonable relationship between rates collected and service rendered can only be maintained by the power exercised by the Commission. If plaintiffs' contentions were sustained, it would cut the heart out of the 1920 amendments to the Interstate Commerce Act. The new objects and purposes to be accomplished, as summarized above, would be nullified. New section 15a would be read out of the act.

[3] 3. That there was ample evidence to support all the Commission's findings of which complaint is now made does not seem to us to be open to serious question. We recognize the fundamental rule that an order of the Commission fixing rates is invalid

unless supported by evidence. New England Divisions Case, supra, 203, 204. This court, however, cannot weigh the testimony as to the reasonableness of the rates or consider the wisdom of establishing them. If acting within its powers, the Commission's judgment and discretion are final as to all matters depending on the weight of testimony or the wisdom of the conclusion reached.

[4] In considering whether the order in question is supported by substantial evidence, the Commission's findings in No. 1624, heard with this case, must be included and considered. See Salt from C. F. A. to Western Trunk Line Destinations and Between Points in C. F. A. Territory, 74 I. C. C. 409. The Commission's findings of fact are not challenged as unsupported by the evidence. The complaint is that the orders made are not supported by those findings. It does not seem to us that the Commission has adopted any erroneous theory in determining what is a minimum rate. We agree with the Commission that no different tests or standards are prescribed for the determination of a just and reasonable minimum rate than for a just and reasonable maximum rate, and that the minimum rate-making power would be ineffectual, if Congress intended that it should be used only in cases where the rate assailed had been proved with mathematical exactness to be less than the cost of service.[1] Such a test is impracticable of application to specific rates on a single commodity.

[5] In fixing minimum, as in adjusting maximum, reasonable rates on a specific commodity from different points of origin to a common destination, it is proper to take into account a variety of factors. Among these are comparisons of going rates on the same commodity in the same or similar territories, the relation of the rates to distances, the revenue per car mile and ton mile, variations in traffic density, and the peculiarities in transportation which affect transportation costs in general. These factors are summarized by the Commission in detail. It is upon this basis that the Commission prescribed the minimum rate from Detroit to Chicago, and adjusted the New York, Ohio, and Kansas rates with relation thereto, and found the rate from Louisiana to be unreasonably low, and prescribed a reasonable minimum. It acted upon evidence of the same kind, but stronger in degree, held sufficient to sustain the Commission's orders against similar attacks in Wisconsin Railroad Commission v. C., B. & Q. R. R. Co., supra, and the New England Divisions Case, supra. It was not necessary that the Commission should first have found that the Detroit to Chicago rate, or the Louisiana to Chicago rate, was noncompensatory, in order that a higher minimum rate might be prescribed, if in fact, as the Commission was justified in finding, proper rate relationships between different carriers and localities could not otherwise be established, or ruinous rate wars, threatening the ability of the Commission to fix rates for the carriers as a whole or in groups, which would permit the earnings prescribed in section 15a, could not otherwise be avoided.

None of the interested producers or carriers are complaining of the Commission's order, except the plaintiffs. The producers and carriers from Detroit to Chicago acquiesce in the prescribed minimum. One witness, it is said, stated that this rate ought to be even higher, if the railroad rates are to be properly realigned; but the Commission found that a higher minimum could not be prescribed because of lake competition. The distance from Detroit to Chicago is 272 miles. By abolishing differences in commodity descriptions and increasing the minimum carload, the carriers' earnings per ton mile will not be greatly increased. The distance from New York mines to Chicago is 563 miles, more than twice the distance from Detroit to Chicago, but the differential allowed is only 8 cents. The distance from the Kansas mine to Chicago is 674 miles, 2½ times the distance from Detroit to Chicago, but the minimum differential required is only 11 cents over Detroit and 3 cents over New York. The distance from Louisiana mines to Chicago is 1,004 miles, nearly four times

---

[1] This clearly appears from New England Divisions Case, at page 196 (43 S. Ct. 275), where it is said: "Third. It is asserted that the order is necessarily based upon the theory that, under section 15 (6), the Commission has authority to fix divisions as between groups of carriers without considering the carriers individually; that Congress did not confer such authority; and that, hence, the order is void. Whether Congress did confer that authority we have no occasion to consider; for it is clear that the Commission did not base its order upon any such theory. The order directs a 15 per cent. increase in the divisions to the several New England lines. It is comprehensive; but it is based upon evidence which the Commission assumed was typical in character, and ample in quantity, to justify the finding made in respect to each division of each rate of every carrier. Whether the assumption was well founded will be discussed later. Here we are to consider merely, whether Congress authorized the method of proof and of adjudication pursued, and whether it could authorize it, consistently with the Constitution."

the distance from Detroit to Chicago, but the minimum differential required is only 14 cents over Detroit to Chicago, 6 cents over New York to Chicago, and 3 cents over Kansas to Chicago. The per ton mile earnings are similarly graduated, the highest being between Detroit and Chicago, and the lowest between Louisiana and Chicago. Comparisons are also made with rates on salt, maintained between other points and distances and with the average per car and ton mile earnings on other commodities between different points. Allowances are also made for variations in traffic density.[2] It is because of lesser density of traffic that Kansas and Louisiana mines are given a minimum rate so low relative to distance. In brief, if the Commission had the power it assumed, its findings of fact amply support its order.

Finding, as we do, that the Commission's order responded to the issues as made, and being of opinion, as we are, that the power assumed was conferred by the Interstate Commerce Act, no justification is found for holding that the Commission's findings of fact were not supported by substantial evidence, or that these facts do not support its order.

Plaintiffs' bill will be dismissed, at their costs.

[2] In our opinion, the Commission did not give undue weight to distance. Nor should it be inferred that we do, because we have not summarized the other elements important in fixing a reasonable rate. This has been done so thoroughly by the Commission that we deem it unnecessary to add to the length of this opinion by doing so here, but are content with a reference to said reports. See Salt from C. F. A. to Western Trunk Line Destinations and Between Points in C. F. A. Territory, 74 I. C. C. 409; Salt Cases, 92 I. C. C. 388.

