ATCHISON, TOPEKA & SANTA FE RAILWAY CO.
ET AL. *v.* UNITED STATES ET AL.

No. 287.   Argued December 3, 4, 1931.—Decided January 4, 1932.

*Mr. Frederick H. Wood,* with whom *Messrs. Walter McFarland, Elmer A. Smith, P. F. Gault, H. H. Larimore, J. N. Davis, A. B. Mason, R. J. Hagman, M. L. Countryman, Jr., R. S. Outlaw, Leslie Craven, A. B. Enoch, Frank A. Leffingwell, William D. Whitney,* and *G. Howland Chase* were on the brief, for appellants.

250

*Mr. Daniel W. Knowlton,* Chief Counsel, Interstate Commerce Commission, with whom *Solicitor General Thacher, Assistant to the Attorney General O'Brian* and *Messrs. E. M. Reidy* and *H. L. Underwood* were on the brief, for the United States et al., appellees.

· *Mr. John E. Benton*, with whom *Mr. Clyde S. Bailey* was on the brief, for the Arizona Corporation Commission et al., interveners and appellees.

*Mr. Hugh LaMaster*, Assistant Attorney General of Nebraska, with whom *Mr. C. A. Sorensen*, Attorney General, was on the brief, for the Nebraska State Railway Commission, appellee.

*Messrs. Charles W. Steiger* and *Ralph Merriam* submitted for the Public Service Commission of Kansas, appellee.

MR. CHIEF JUSTICE HUGHES delivered the opinion of the Court:

These suits, which were consolidated, were brought by carriers by railroad in the Western District, and by certain shippers, to restrain the enforcement of an order of the Interstate Commerce Commission made July 1, 1930, as amended by a supplemental order of April 10, 1931. The order prescribed maximum rates for the transportation of grain and grain products on domestic shipments within the Western District [1] and for export, as described, and directed the carriers to desist from certain practices (164 I. C. C. 619; 173 *id.* 511). Other carriers were permitted to intervene as parties petitioners, and state commissions and certain state organizations were admitted as intervening defendants. This appeal is from the order of the District Court, as specially constituted,[2] denying the applications of the petitioners for an interlocutory injunction. 51 F. (2d) 510.

Following the passage of the Joint Resolution of the Congress of January 30, 1925 [3] known as the Hoch-Smith Resolution, the Interstate Commerce Commission insti-

---

[1] The Western District was defined in the order of July 1, 1930, as that part of continental United States " on and west of the Mississippi River, west of Lakes Superior and Michigan, and west of and including Illinois."

[2] U. S. C., Tit. 28, § 47.

[3] C. 120, 43 Stat. 801.

tuted a general investigation [4] of the rate structures of common carriers to determine whether their rates, charges, regulations and practices were unjust, unreasonable, unjustly discriminatory or unduly preferential, or otherwise in violation of law. The investigation was divided into separate parts, and the proceeding in one of them (Part VII) terminated in the order under review. In connection with this proceeding there were a large number of formal complaints and suspension proceedings which, considered together, brought into issue all phases of the grain rate structure involved in the Commission's general investigation. Many state commissions, chambers of commerce, and trade and traffic associations participated in the proceeding. Hearings were held in many cities and extended over a year. The record was closed on September 22, 1928, and after protracted argument the matter was submitted, on July 1, 1929, to the Commission for its decision. The first report of the Commission, made on July 1, 1930, emphasized the magnitude of its task, in dealing with " three score and more of major issues, affecting every part of a vast territorial domain," and the thorough examination that had been made of the exceptionally voluminous record. The order of July 1, 1930, was to go into effect on October 1, 1930, but because of mechanical difficulties in the preparation and printing of the tariffs, containing the great number of the revised rates, the effective date was postponed from time to time.

In September, 1930, the carriers asked for a rehearing, which was denied in November, 1930. Prior to its denial, a statement was submitted to the Commission on behalf of the Western Association of Railway Executives, directing attention to the serious financial condition of the carriers. A further petition for rehearing was pre-

---

[4] Docket No. 17,000.

sented to the Commission on February 18, 1931. This petition described in great detail the situation then existing.. The carriers alleged that since the closing of the record before the Commission in September, 1928, there had been material and important changes in the operating, traffic and transportation conditions in the Western District, which affected adversely the revenues of the carriers, and that, regardless of the question of the validity and propriety of the order when made, it would no longer be valid and proper in the light of the existing circumstances. The carriers alleged and offered to prove that, if the order became effective, it would reduce the gross and net operating revenues of the carriers in the Western District not less than $20,000,000 annually; that their aggregate revenues in the first eleven months of 1930 were 14.92 per cent. lower than in the corresponding period of 1929; that the complete figures in respect of the revenues for December, 1930, were not yet available but that the volume of traffic then carried was substantially less than that of December, 1929; that the revenue freight car loadings in January, 1931, showed a substantial decline (14.06 per cent.) from those of 1930 and an even greater decline (20.98 per cent.) as compared with those of 1929; that the net operating income of these carriers for 1930 was over $100,000,000 less than their average annual net operating income for the five preceding years; that the changes in conditions since the record before the Commission was closed had been such as seriously to impair the credit of the carriers; that not only had the market price of their common and preferred stock declined to such a level that it would be impossible for them to secure additional capital through the sale of stock, but that their bond issues also, in many instances, had ceased to command the credit which they formerly enjoyed; that the decrease of railroad earnings had been such as to jeopardize the eligibility of these bonds for savings bank investments, and that there had been a large decline in the holdings of the secu-

rities of these carriers by both savings banks and life insurance companies; and that if the order of the Commission should become effective, it would, under the conditions then present, threaten the maintenance of an adequate system of transportation. In support of their allegations as to changed conditions, the petitioners submitted many other facts and statistical tables of traffic and revenues.

The Commission denied the application for rehearing on March 3, 1931. On April 10, 1931, the Commission made its supplemental report and order, modifying and supplementing in certain particulars its original report and order, and provided that the order as thus modified should become effective on June 1, 1931. Thereupon, these suits were brought.

The petition in the carriers' suit challenged the order as having been made in disregard of the provisions of the Interstate Commerce Act. The original and supplemental reports of the Commission, and the above-mentioned petitions for rehearing, were annexed to the petition and made a part of it. Reference was made to the statement of the Commission, in its special report of January 21, 1931, to the Senate Committee on Interstate and Foreign Commerce, that the railroads had "never been able, since 1920, to obtain the aggregate earnings contemplated by section 15a" (of the Interstate Commerce Act) "and they are faced with continually increasing competition from other forms of transportation." Reciting earlier orders of the Commission bearing upon rates for the transportation of grain and grain products,[5] the carriers averred that the order of

---

[5] Increased Rates, 1920, 58 I. C. C. 220; Rates on Grain, Grain Products and Hay, 64 I. C. C. 85; Reduced Rates, 1922, 68 I. C. C. 676; Rates on Grain, Grain Products and Hay, 80 I. C. C. 362; Kansas Public Utilities Commission v. A. T. & S. F. Ry. Co., 83 I. C. C. 105; Rates and Charges on Grain and Grain Products, 91 I. C. C. 105.

the Commission was a complete reversal of its previous action; that the Commission had found that the revenue of the carriers for the Western District from the carriage of grain and grain products amounted to 12.1 per cent. of their total revenues in 1924, that year being used in the report as representative, and that the effect of the order in question would be to reduce the general level of rates on this traffic approximately 13 per cent., causing a serious diminution (to the amount of $20,000,-000 annually) in the gross and net operating income of these carriers. The petition set forth the passage of the Hoch-Smith Resolution and the order of the Commission in relation to the rates on deciduous fruits from California, which had been held by this Court to be invalid because based upon an erroneous construction of the Resolution,[6] and the carriers charged that, in making the reports and order here in question, the Commission had proceeded upon a like misconception of its powers. Stating the substance of their petition (February, 1931) for rehearing, the carriers further charged that the denial of that petition, in view of changed conditions, was itself an abuse of administrative discretion and, by depriving the carriers of the hearing to which they were entitled, constituted a denial of due process in violation of the Fifth Amendment of the Constitution of the United States.

In their answers, the United States and the Commission denied that the action of the Commission was in any respect unauthorized or unlawful, and on the contrary alleged that the Commission had carefully considered the evidence before it in the light of its experience and that the evidence fully supported its order.

[6] California Growers' and Shippers' Protective League *v.* Southern Pacific Co., 129 I. C. C. 25; 132 *Id.* 582; *Ann Arbor R. Co.* v. *United States,* 281 U. S. 658.

On the application for an interlocutory injunction, the evidence taken before the Commission was not presented to the District Court. Affidavits were submitted by the carriers which were addressed to the effect of the order upon their revenues. The District Court made findings of fact, reciting the findings set forth in the report of the Commission and, in the view that these were conclusive in the absence of the evidence, and that no errors of law had been committed, the application was denied.

The appellants contest this conclusion, contending that the report of the Commission and concurring opinions of Commissioners disclosed that the Commission had misapprehended its authority under the Hoch-Smith Resolution and that the Commission had failed to make the findings which were essential to support its decision under the applicable law; that this was shown by the special and extended consideration given by the Commission to the depression of agriculture and the lack of other and proper foundation for the order; that the Commission had not performed its duty to consider and apply the provisions of § 15a of the Interstate Commerce Act and had exceeded its power by resorting to different standards from those established by §§ 1 and 15 of the Act; and that the ultimate finding of the Commission, expressed in the words of the statute, that the existing rates were unreasonable to the extent that they exceeded the rates prescribed, was not in itself sufficient to support the order, as it otherwise appeared to have been erroneously based.

We do not find it to be necessary to consider these contentions, and the counter arguments advanced on behalf of the Commission, or to review the Commission's reports, as it is sufficient for the present purpose to deal with the fundamental question presented by the action of the Commission in denying the appellants' second application for a rehearing. Ordinarily, a petition for rehearing is for

the purpose of directing attention to matters said to have been overlooked or mistakenly conceived in the original decision and thus invites a reconsideration upon the record upon which that decision rested. The second petition for rehearing, in this proceeding, was not of that character. It was of the nature of a supplemental bill. It presented a new situation, a radically different one, which had supervened since the record before the Commission had been closed in September, 1928. It asserted that whatever might be the view of the order when made, and upon that record, a changed economic condition demanded reopening and reconsideration. The carriers insisted upon this reopening as a right guaranteed to them not only by the Act of Congress but by the Constitution itself.

There can be no question as to the change in conditions upon which the new hearing was asked. Of that change we may take judicial notice. It is the outstanding contemporary fact, dominating thought and action throughout the country. As the Interstate Commerce Commission said in its recent report to the Congress,[7] " a depression such as the country is now passing through is a new experience to the present generation." The Commission also recognized in that report " the very large reductions in railroad earnings which have accompanied the economic depression," and stated that " the chief cause of these reductions has been loss of traffic." For " in such depressions the railroads suffer severely. Their traffic is a barometer of general business conditions." [8]

It is plain that a record which was closed in September, 1928—relating to rates on a major description of the traffic of the carriers in a vast territory—cannot be regarded as representative of the conditions existing in

---

[7] 45th Annual Report, December 1, 1931; House Doc. No. 30, 72d Cong., 1st Sess., p. 114.

[8] *Id.*

1931. That record pertains to a different economic era and furnishes no adequate criterion of present requirements. While the effects of the widespread economic disturbance have had a progressive manifestation, they had been sufficiently revealed in February, 1931, when the second petition for rehearing was made, to compel the conclusion that the record of 1928 afforded no sufficient basis for the order of the Commission. The facts were set forth in the carriers' petition. They pointed out the grave reductions, in traffic and earnings, from which they were suffering, that their net operating income for 1930 was over $100,000,000 less than their average annual net operating income for the five years preceding, and that their credit was seriously impaired. At the time of this petition, the order revising the rates on grain and grain products in the Western District had not yet become effective, but the Commission stood upon the record of 1928 and, without reopening the proceeding or taking further evidence, provided that its order should become effective on June 1, 1931. In justification of this course, it is urged on behalf of the Commission that its determination had been reached after regularly conducted and protracted hearings in which carriers and shippers had coöperated and that the adjustments related not only to the level of rates but to the relation of rates and to discriminatory and wasteful practices, and that a reopening would have meant further lengthy proceedings. It is said that 'in performing its legislative function of prescribing reasonable rates, the Commission necessarily projects into the future the results of a decision based on the conditions disclosed in the record,' and that its determination 'cannot reflect accurately fluctuating conditions.' These suggestions would be appropriate in relation to ordinary applications for rehearing, but are without force when overruling economic forces have made

the record before the Commission irresponsive to present conditions. This is not the usual case of possible fluctuating conditions, but of a changed economic level. And the prospect that a hearing may be long does not justify its denial if it is required by the essential demands of justice.

We are thus brought to the fundamental considerations governing the authority of the Commission. It has broad powers and a wide extent of administrative discretion, with the exercise of which, upon evidence, and within its statutory limits, the courts do not interfere. The important and salutary functions of the Commission to enforce public rights are not to be denied or impaired. But the Commission, exercising a delegated regulatory authority which does not have the freedom of ownership, operates in a field limited by constitutional rights and legislative requirements. Its duty under §§ 1 (5), 3 (1) and 15 (1) of the Interstate Commerce Act with respect to the prescribing of reasonable rates and the preventing of unreasonable or unjustly discriminatory or unduly preferential practices, has not been changed by the Hoch-Smith Resolution. *Ann Arbor R. Co.* v. *United States,* 281 U. S. 658, 669. The legal standards governing the action of the Commission in determining the reasonableness of rates are unaltered. In the discharge of its duty, a fair hearing is a fundamental requirement. *Interstate Commerce Comm.* v. *Louisville & Nashville R. Co.,* 227 U. S. 88, 91. In the instant proceeding, the hearing accorded related to conditions which had been radically changed, and a hearing, suitably requested, which would have permitted the presentation of evidence relating to existing conditions, was denied. We think that this action was not within the permitted range of the Commission's discretion, but was a denial of right. The order of the Commission which was thus made effective, and the ensuing supplemental order, cannot be sustained.

The order of the District Court refusing an interlocutory injunction is reversed, and the cause is remanded with direction to grant the injunction as prayed.

*Reversed.*