**STATE OF NEW YORK et al. v. UNITED STATES.**

**ATCHISON, T. & S. F. RY. CO. et ,al. v. SAME.**

Civil Actions Nos. 2311, 2337.

District Court, N. D. New York.

May 9, 1946.

858

Parker McCollester and Frank J. Clark, Sp. Asst. Attys. Gen., for the State of New York.

Herbert T. Ferguson, Asst. Atty. Gen., for the State of Wisconsin.

Kenneth L. Sater and Hugh S. Jenkins, both of Columbus, Ohio, for the State of Ohio.

Robert Peacock, Deputy Atty. Gen., for the State of New Jersey.

Henry E. Foley, of Boston, Mass., for New England Governors.

Vincent G. Hart, of New York City, for Department of Law of the State of New York.

H. C. Barron, D. Robert Thomas, and Douglas F. Smith all of Chicago, Ill., for Western Railroads.

Edward H. Miller, Sp. Asst. to Atty. Gen. (David O. Mathews. Sp. Asst. to Atty. Gen., of counsel), for the United States.

Daniel W. Knowlton, Chief Counsel to the U. S. Interstate Commerce Commission, of Washington, D. C., for Interstate Commerce Commission.

George T. Simpson, of St. Paul, Minn., for J. A. A. Burnquist, Atty. Gen., and the State of Minnesota.

J. V. Norman, of Louisville, Ky., for the ·Southern States and Southern Governors' Conference.

Byron M. Gray, of Topeka, Kan., for States of North Dakota, South Dakota, Kansas, Nebraska, Oklahoma, Texas, and Arkansas, and their respective State Commissions.

C. E. Logwood, Public Service Commission of South Carolina, for Public Service Commission.

Robert F. Park, of Montgomery, Ala., for Alabama Public Service Commission.

Lewis Petteway, of Tallahassee, Fla., for Florida Railroad Commission.

Karl J. Stipher, Deputy Atty. Gen., of Indiana, for the State of Indiana.

J. C. Murray, of Little Rock, Ark., for State of Arkansas, the Governor of Arkansas, and the Arkansas Public Service Commission.

Neal E. Williams, of Fargo, N. D., for Nels G. Johnson, Atty. Gen. of North Dakota, and Public Service Commission, State of North Dakota.

H. Emerson Kokjer, Deputy Atty. Gen. of Nebraska, for State of Nebraska and Nebraska State Railway Commission.

Duane T. Swanson, of Lincoln, Neb., for State Railway Commission.

C. B. Bee, of Oklahoma City, Okl., for Governor Robert S. Kerr, State of Oklahoma, Corporation Commission, and Western and Southwestern States.

Walter R. McDonald, Georgia Public Service Commission, of Atlanta, Ga., for Southeastern Association of Railroad and Utilities Commissioners.

Jerry W. Carter, of Tallahassee, Fla., for Florida Railroad Commission.

James Noel, Asst. Atty. Gen., for State of Texas and Railroad Commission of Texas.

Before CHASE, Circuit Judge, and KNOX and BRENNAN, District Judges.

CHASE, Circuit Judge.

The Commission acted, in making the investigations and the resulting orders, pursuant to its conception of its duties as the agency created to administer the Interstate Commerce Act (49 U.S.C.A. § 1), which will hereinafter be called the Act. Its action was taken particularly with reference to Section 1(4), which imposes upon every railroad which is a common carrier in interstate commerce the duty "to provide and furnish transportation upon reasonable request therefor, and to establish * * * just and reasonable rates, fares, charges, and classifications applicable thereto; * * *."

And to Section 1(5) (a), which provides that:

"All charges made for any service rendered or to be rendered in the transportation of passengers or property, * * * or in connection therewith, shall be just and reasonable, and every unjust and unreasonable charge for such service or any part thereof is prohibited and declared to be unlawful."

Also to Section 3(1), which, as amended by the Transportation Act of 1940, 49 U.S. C.A. § 3(1), provides that it shall be unlawful:

"For any common carrier * * * to make, give, or cause any undue or unreasonable preference or advantage to any particular person, company, firm, corporation, association, locality, port, port district, gateway, transit point, region, district, territory, or any particular description of traffic, in any respect whatsoever; or to subject any particular person, company, firm, corporation, association, locality, port, port district, gateway, transit point, region, district, territory, or any particular description of traffic to any undue or unreasonable prejudice or disadvantage in any respect whatsoever: * * *."

"That whenever, after full hearing, upon a complaint made as provided in section 13 of this part, or after full hearing under an order for investigation and hearing made by the commission on its own initiative, either in extension of any pending complaint or without any complaint whatever, the commission shall be of opinion that any individual or joint rate, fare, or charge whatsoever demanded, charged, or collected by any common carrier or carriers subject to this part for the transportation of persons or property, as defined in the first section of this part, or that any individual or joint classification, regulation, or practice whatsoever of such carrier or carriers subject to the provisions of this part, is or will be unjust or unreasonable or unjustly discriminatory or unduly preferential or prejudicial, or otherwise in violation of any of the provisions of this part, the commission is hereby authorized and empowered to determine and prescribe

what will be the just and reasonable individual or joint rate, fare, or charge, or rates, fares, or charges, to be thereafter observed in such case, or the maximum or minimum, or maximum and minimum, to be charged, and what individual or joint classification, regulation or practice is or will be just, fair and reasonable, to be thereafter followed, and to make an order that the carrier or carriers shall cease and desist from such violation to the extent to which the commission finds that the same does or will exist, and shall not thereafter publish, demand, or collect any rate, fare, or charge for such transportation other than the rate, fare, or charge so prescribed, or in excess of the maximum or less than the minimum so prescribed, as the case may be, and shall adopt the classification and shall conform to and observe the regulation or practice so prescribed." 49 U.S.C.A. § 15(1).

The inquiries were commenced, the reports filed, and the order made as provided in Sections 13(2), 14(1) and 15(1) of the Act, 49 U.S.C.A. §§ 13(2), 14(1), 15(1).

In the first of the two suits which were brought the plaintiffs and the intervenors who support them attack the ad interim order on the grounds that it is an attempt to regulate industrial conditions by means of rate making; that it is the result of political agitation; that findings essential to support the order are lacking and that the evidence does not support the findings made, in that there is no proof of facts to support so-called ultimate findings above quoted to keep them from being merely arbitrary and capricious. These so-called preliminary findings which are lacking and of which proof is also lacking are said to be that there is no finding of a threatened rate war which would jeopardize the revenues of the railroads in Official Territory; or that the existing class rates are not fully compensatory to railroads in Official Territory for the transportation services for which they are charged; or that they are so low as to cast an undue burden upon other traffic. Also it is argued that the finding of undue prejudice and preference created as between territories by the present class rates is arbitrary be-

cause not based upon preliminary findings made on proof by means of substantial evidence to the effect that the class rates published are the rates at which the freight moves; because findings and proof of a competitive relationship between the party preferred and the party prejudiced are lacking; because findings and proof of substantial injury to the party found to be prejudiced and of substantial benefit to the party found to be preferred are lacking; because findings and proof that the same carrier or carriers are responsible for or control both the preferential and prejudicial rates are lacking; because findings and proof that the carriers charge existing class rates on the same kinds of freight moved into Official Territory which is carried at class rates within Official Territory are lacking; because findings and proof that similar freight is carried under similar conditions in each territory are lacking; and perhaps there are other grounds of similar nature. The suit brought by the Western Lines and supported by the intervenors aligned with them adds the ground that the ad interim reduction in the class rates in the West is confiscatory.

The potency of much of the argument in support of the grounds relied on by the plaintiffs depends upon the effect to be given the before mentioned amendment to section 3(1) of the Act by the Transportation Act of 1940 and to section 5(b) of the latter, 49 U.S.C.A. § 3 note. The change thus made in section 3(1) of the Act was the addition of the words "region, district, territory" following "transit point" in the enumeration of the persons, places and traffic as to which preference and prejudice was expressly made unlawful and prohibited. In accordance with what has become a somewhat common practice, the Transportation Act of 1940 contains a declaration of policy which in part is "to encourage the establishment and maintenance of reasonable charges for transportation services, without unjust discriminations, undue preferences or advantages or unfair or destructive competitive practices." 54 Stat. 899. And in section 5(b) is found what is known as the Ramspeck Resolution, where it is provided that:

"The Interstate Commerce Commission is authorized and directed to institute an investigation into the rates on manufactured products, agricultural commodities, and raw materials, between points in one classification territory and points in another such territory, and into like rates within any of such territories, maintained by common carriers by rail or water subject to part I of the Interstate Commerce Act, as amended, for the purpose of determining whether said rates are unjust and unreasonable or unlawful in any other respect in and of themselves or in their relation to each other, and to enter such orders as may be appropriate for the removal of any unlawfulness which may be found to exist: * * *."

The Commission undertook to carry out the mandate of this statute by means of the investigations it had already initiated as above set forth. It found, however, that because of conditions largely attributable to the war, it was advisable to confine its investigation and orders to classifications and class rates established and maintained by common carriers by rail and accordingly did so.

But it is earnestly argued by the plaintiffs, especially by the Western Lines, that the Commission misinterpreted the above changes in the statute to amount to a mandate requiring it to bring about an equalization and uniformity of rates for like kinds and amounts of commodities mile for mile among the various rate territories of the country and to increase its powers so to do. It is recalled that the Commission had previously mistakenly construed the so-called Hoch-Smith Resolution to give it added powers to correct what it found to be unjust discriminations "as between the various localities and parts of the country." And it is pointed out that if such a mistaken interpretation has been made the order which is the result of it is erroneous and must be set aside. Ann Arbor R. v. United States, 281 U.S. 658, 50 S.Ct. 444, 74 L.Ed. 1098; Atchison, T., & S. F. R. v. United States, 284 U.S. 248, 262, 52 S.Ct. 146, 76 L.Ed. 273. That the same mistake has been made is thought to be apparent because the words "parts of

the country" in the above quotation from the Hoch-Smith Resolution are as broad and comprehensive as "regions, districts, territories" added by the 1940 Amendment to section 3(1). Yet even if this premise be true, it does not follow that the same mistake has not been made. It does not appear that the Commission has herein acted upon any assumption that the 1940 changes altered the basic principles governing its action. On the contrary, it appears that in determining the existence of discriminatory rates it has construed the changes in the statute to mean that where it is found that class rates are different in the different territories, and interterritorially, and those differences cannot be justified under recognized principles of rate making by proof of sufficient differences in costs of transportation, composition and amount of traffic, competition by common carriers other than railroads, and the like, those rates may be found unjustly preferential or prejudicial because unduly discriminatory and consequently unlawful as between regions, districts and territories.

We think this interpretation of section 3(1) of the Act as amended is supported by the legislative history. The original Interstate Commerce Act was primarily aimed at the elimination of unjust discriminations of various kinds. Louisville & Nashville R. v. United States, 282 U.S. 740, 749, 750, 51 S.Ct. 297, 75 L.Ed. 672. Yet it did not until the amendment of section 3(1) in 1940 expressly prohibit unjust discriminations against any region, district or territory as such. "Territory" had become a word of art denoting the several rate territories which had grown up and, by adding region and district, parts of such territories were included to amplify the words "locality, port, port district, gateway, transit point" which had previously been the only designation of what might be called geographical units in the specific reference in the statute to a "person, company, firm, corporation, association, * * *, or any particular description of traffic" as to which unjust preference and

prejudice and discrimination were made unlawful. These words had proved to be, in their effect upon geographical designation as such, of somewhat restricted application as was shown by Texas & Pacific R. v. United States, 289 U.S. 627, 53 S.Ct. 768, 77 L.Ed. 1410.

This amendment to section 3(1) appeared in S. 2009. In the report made by the Senate Committee on Interstate Commerce[4] it was said as to section 3(1), "There has been no substantial change therein, except that the words 'region, district and territory' appearing in lines 20 and 23 on page 26 have been inserted." And the chairman of the committee said in part in explanation of the amendment, "The previous provision with regard to 'discrimination' simply referred to discrimination as to 'locality, port, port districts, gateway, transit point' without specifying the region, district or territory. So, we felt that by broadening the language we would at least take away that excuse, and we would provide expressly that the Commission should not discriminate in its rate structures."[5] In the discussion of the bill in the Senate the chairman of the committee in charge of it was asked if he thought the proposed amendment of section 3(1) would make toward the equalization of rates in the various regions. And he replied, "I do not think there is any doubt about it at all, because that is the purpose of the bill; it is the intention of the bill."[6] We think section 3(1) as thus amended does add new factors to be taken into account by the Commission in determining, under the old and well recognized principles which were before guides to decision in such matters, whether existing rates are unlawful. These new factors are whether such rates are unjustly preferential, prejudicial and discriminatory as between regions, districts or territories; and, in our opinion, section 3(1) now empowers the Commission to find such rates unlawful even though they would have been lawful in the light of all relevant considerations before the amendment. We may, indeed,

---

[4] Report No. 433, 76 Cong. 1st Session at page 11.

[5] Cong. Rec. Vol. 84, Part 6, p. 5889, 76th Cong., 1st Sess.

[6] Cong. Rec., Vol. 84, part. 6, p. 6072.

take it for granted that they were lawful previous to the amendment since they had been in the main the result of comparatively recent investigations and orders of the Commission. That the Commission correctly interpreted its powers and duties after the amendment appears to be shown by the following quotation from its report: "By the amendment to the substantive anti-discrimination provisions of section 3(1) all discriminations in the form of undue or unreasonable preference or advantage, or undue or unreasonable prejudice or disadvantage, as between regions, districts, or territories, viewed as separate entities, were brought directly within the purview of the act along with all the other inhibitions previously included. We were then authorized and directed by the other provisions mentioned to remove any such discriminations found to exist in a proper proceeding. This means that such discriminations as those mentioned which result from differences in the methods of distributing the general rate burden in the several rate-making territories, or from any other cause, if not justified upon proper consideration of recognized elements of rate making applied in the light of the amended law are unlawful and should be corrected."

■ We therefore, hold that the Commission correctly decided that the ad interim order under review was within the scope of its statutory power and proceed to determine whether the order was erroneous in any respect on the other grounds advanced for setting it aside.

■ First, there should be a brief allusion to the contention that the plaintiff States have no standing to sue as parens patriae but only as shippers and receivers of freight. This point has become more or less academic since there are states who are parties plaintiff who plainly may sue as freight shippers and consignees directly affected by the order. But all the States who are parties are political entities which are also regions or districts within the rate-making territories involved and they are directly affected as such and have an interest in behalf of their citizens and communities above and apart from the rights of any particular shipper or receiver of freight to a continuance of existing rates or the maintenance of others. This we think distinguishes such cases as Oklahoma v. Atchison, T. & S. F. R., 220 U.S. 277, 286, 31 S.Ct. 434, 55 L.Ed. 465; Sprunt & Son, Inc. v. United States, 281 U.S. 249, 50 S.Ct. 315, 74 L.Ed. 832; and Alabama Power Co. v. Ickes, 302 U.S. 464, 58 S.Ct. 300, 82 L.Ed. 374, and gives these States standing to sue as parens patriae to preserve or enhance the welfare of their citizens by securing to them the proper administration of federal laws under the principles applied in Georgia v. Pennsylvania R., 324 U.S. 439, 446-52, 65 S.Ct. 716, 89 L.Ed. 1051.

■ Our review of orders made by the Commission within the scope of its authority is limited to the following broad considerations and matters incidental thereto: (1) Whether the order is based upon adequate findings; (2) whether there is substantial evidence in the record to support the findings made; and (3) whether the record was made as the result of adequate hearings of which due notice was given to all interested parties and at which those who appeared were fairly permitted to present their evidence and be heard in argument. Board of Trade v. United States, 314 U.S. 534, 62 S.Ct. 366, 86 L.Ed. 432; Rochester Telephone Corp. v. United States, 307 U.S. 125, 140, 59 S.Ct. 754, 83 L.Ed. 1147; Atchison, T., & S. F. R. v. United States, 284 U.S. 248, 52 S.Ct. 146, 76 L.Ed. 273; Merchants' Warehouse Co. v. United States, 283 U.S. 501, 51 S.Ct. 505, 75 L.Ed. 1227.

We may dispose of the last of these quickly. It is apparent that the Commission did give due notice to all interested parties; that it did conduct numerous and lengthy hearing in various parts of the country involved; and that it did admit into the record and give proper consideration to, after giving a fair opportunity for argument, such relevant evidence as was offered.

■ In considering the second we are limited to a search for substantial evidence to support such findings as were

made. There is such evidence. While it is not uncontradicted, the over-all weight of the evidence cannot be determined by us but is for the sole consideration of the Commission. Questions pertaining to the effect of rates and to rate making are extremely involved and highly technical matters and have to be decided after evaluating intricate evidence which is often based in part upon assumptions. Persons unskilled in those matters are much handicapped in dealing with such subjects and the well established rule is that the expert knowledge of the Commission and its experience, when resorted to and given effect in sufficiently supported findings which are the result of adequate and properly conducted proceedings, should be left undisturbed by the courts under the doctrine of administrative finality. Rochester Telephone Corp. v. United States, supra; Interstate Commerce Commission v. Illinois C. R. R., 215 U.S. 452, 30 S.Ct. 155, 54 L.Ed. 280; Chicago, St. P., M. & O. R. v. United States, 322 U.S. 1, 64 S.Ct. 842, 88 L.Ed. 1093; Gregg Cartage & S. Co. v. United States, 316 U.S. 74, 62 S.Ct. 932, 86 L.Ed. 1283.

 In considering the first, we must decide whether the so-called primary findings and proof to support them are indispensable to establish the kind of unlawfulness here found by the Commission in the light of the above-mentioned amendment of the Act.

 Such primary findings need not be listed again. We now refer to them as set forth in the above statement. They relate in one way or another to what have been held essential to be proved to establish a basis for findings of preference, or prejudice or discrimination as to rates before the amendment of 1940 to section 3(1) of the Act. They are matters which are still pertinent and if evidence to support findings to supply the lack pointed out. as to this record had, or could have been, offered it would undoubtedly have been admissible and findings in accord with it would have given added support to the order made. But it is quite another thing to say that all such findings are needed to

support the so-called ultimate findings made and the ad interim order based on them. For instance, it has been argued that there can be no increase in class rates in Official Territory unless there is first a so-called primary finding, supported by substantial evidence that the present rates are not compensatory. While that fact, if proved, would have been of much significance the failure to prove it and the consequent lack of a finding that present rates are confiscatory does not leave the Commission's finding that the rates are unlawful unsupported by substantial evidence. It weighed all the evidence and found that it tipped the scales in favor of its ultimate finding that the present rates were unlawful. That basic conclusion if supported sufficiently by other evidence, was enough to justify the exercise of the Commission's statutory power to alter the rates as needed to make them lawful for the future. Pennsylvania R. Co. v. United States, 323 U.S. 588, 65 S.Ct. 543, 89 L.Ed. 478; Chicago, B. & Q. R. v. United States, D. C., 60 F.Supp. 580; Scandrett v. United States, D.C., 32 F.Supp. 995, affirmed 312 U.S. 661, 61 S.Ct. 736, 85 L.Ed. 1108; Jefferson Island Salt Mining Co. v. United States, D.C., 6 F.2d 315. We think enough was proved and found to warrant such basic conclusion.

 There was ample evidence on which the Commission found that the class rates in the various territories involved and the interterritorial class rates among those territories were on different levels within the existing classification as well as based upon differing classifications. The Commission found on substantial evidence many so-called primary facts, which need not be enumerated here but which appear in its report, showing transportation costs, composition of traffic, kinds of markets, natural resources, commodities produced or manufactured in the various territories and the parts' thereof, and found preference, prejudice, and discrimination as above set forth. Having found the basic facts as pointed out, the Commission was under the duty to exercise its judgment and discretion in determining their effect upon the territories. We may not agree with its de-

cision and we may not agree with the wisdom of the ad interim order but we have no power to set the order aside because of any such disagreement and substitute our own judgment for that of the Commission. Norfolk & Western R. v. United States, 287 U.S. 134, 53 S.Ct. 52, 77 L.Ed. 218. For instance, it would be unlawful because discriminatory to try to equalize clearly inherently unequal business conditions, not due to existing freight rates in the various territories or any regions or districts therein, by manipulating rates. Anchor Coal Co. v. United States, D.C., 25 F.2d 462. We might think that the probable import of this order, but we are bound by the Commission's action in justifiably finding facts to give another, and a lawful, basis for it. Again it is well known that there is a zone of reasonableness between the maxima and minima in rate making in which a carrier may usually set the rates it charges. United States v. Chicago, M., St. P. & P. R., 294 U.S. 499, 55 S.Ct. 462, 79 L.Ed. 1023. We might think these existing class rates are within such a zone, but again we may not interfere with the order for that reason. Nor can other like considerations prevail to brush aside the statutory control over rates which has been confided to the Commission.

It has been earnestly argued that the investigations and order under review are the result of political agitation having for its ultimate object the dislocation of industry from Official Territory and its establishment in the other territories, principally in the Southern, and that does appear plausible. Yet such a question is not within the bounds of judicial cognizance but relates to matters of legislative policy. Whether such policy is wise or the opposite is not for us to determine. We can only be concerned with decision as to whether or not the Commission's action was within its power properly exercised under statutory authority which does not go beyond Constitutional limitations. Chicago, B. & Q. R. v. McQuire, 219 U.S. 549, 31 S.Ct. 259, 55 L.Ed. 328; Rochester Telephone Corp. v. United States, supra.

The contention that the order should be set aside as to the Western Lines because confiscatory as to them raises a question of Constitutional limitation under the Fifth Amendment upon the statutory authority which can be conferred upon the Commission. The railroads in Southern territory make no such contention and it would seem that the Western Lines came somewhat late to rely upon any violation of Constitutional safeguards as to them.

From the cost studies relied upon by the Commission after it decided what weight should be given them, the Commission found that what is called less-than-carload traffic is not, when war-time loading is excluded, "yielding, on the average, its out-of-pocket costs plus constant expenses solely related to this traffic, plus the cost of collection and delivery, in any territory except possibly in the southern where the margin of difference between revenues and these expenses is slight". It is, therefore, argued that the confiscatory nature of the ordered reduction in class rates moving in less-than-carload lots is self-evident and that as it does not produce its out-of-pocket costs no trial period is necessary to determine the unlawfulness of the order since an increase in traffic brought about by the lowered rates would obviously but increase the out-of-pocket costs and increase the deficit.

It will be remembered that the Western Lines carry only .6 of one per cent of their total freight at rates affected by this order. We don't suggest that even that is less than enough to entitle them to relief if they can show that they will be compelled to carry it in the future for less than actual cost. But this less-than-carload traffic to which the cost studies relate is not by any means wholly carried on class rates and in its supplemental report of October 30, 1945 the Commission correctly said:

"The cost data on less-than-carload traffic relates to such traffic as a whole and not solely to that which moves on class rates. In appraising the figures it must be borne in mind that much of this traffic does not move on class rates, but on exception and commodity rates. Obviously, the class-rate traffic bears the highest rates. Consequently, even if under present condition less-than-

carload traffic, as a whole, in the West and South is not paying its proper share of the costs, it is possible that such a result is due in large measure to the maintenance of exception and commodity rates. In any event, data based only on averages for all this traffic do not necessarily demonstrate the impropriety of reductions in the highest level of rates. Even as to class rates on less-than-carload traffic, the record shows that in western trunk-line and southwestern territories many intrastate class rates are maintained which are lower than the corresponding reduced interstate class rates required by our interim order."

The attempt in this court by the Western Lines to break down less-than-carload lot carriage into parts carried wholly on class rates and parts as to which the above finding of the Commission is correct, and to show that the part carried wholly on class rates would not pay its way under the ad interim order has failed in our judgment to measure up to the required standard of certainty by way of proof as to transportation costs for particular commodities. Compare, Baltimore & Ohio R. v. United States, supra. There is too much assumption and opinion involved in such evidence to justify definite findings, in advance of a trial period, to the effect that the ad interim rates will be confiscatory. See St. Joseph Stock Yards Co. v. United States, 298 U.S. 38, 56 S.Ct. 720, 80 L.Ed. 1033; Minnesota Rate Cases, 230 U.S. 352, 33 S.Ct. 729, 57 L.Ed. 1511, 48 L.R.A.,N.S., 1151, Ann.Cas.1916A, 18; Willcox v. Consolidated Gas Co., 212 U.S. 19, 29 S.Ct. 192, 53 L.Ed. 382, 48 L.R.A., N.S., 1134, 15 Ann.Cas. 1034; City of Knoxville v. Knoxville Water Co., 212 U.S. 1, 29 S.Ct. 148, 53 L.Ed. 371.

Nor is the order erroneous because the carriers were not allowed any alternative method for the removal of the discriminations which make the present class rates unlawful. This was a rate order made under Par. 15 and not an order under Par. 3 in which an alternative must be provided as held in Texas & Pacific R. v. United States, supra.

The denial by the Commission of the application to reopen the proceedings and receive additional evidence especially as to conditions subsequent to 1939 was not an abuse of its discretion. It is inevitable in such matters that an order by the Commission cannot be based on strictly up-to-the-minute proof. There must be unusual circumstances, not here present, to justify the reversal of an order such as this on the ground that it was based on a stale record. Interstate Commerce Commission v. City of Jersey City, 322 U.S. 503, 64 S.Ct. 1129, 88 L.Ed. 1420. But see, Atchison T. & S. F. R. v. United States, 284 U.S. 248, 52 S.Ct. 146, 76 L.Ed. 273 as limited by United States v. Northern Pacific R., 288 U.S. 490, 53 S.Ct. 406, 77 L.Ed. 914.

A decree will be entered dismissing the petitions in each case but the dismissal of the petition by the Western Lines will be without prejudice to another suit to restrain the enforcement of the ad interim rates if they are found, after a fair test, to be confiscatory. See, Darnell v. Edwards, 244 U.S. 564, 37 S.Ct. 701, 61 L.Ed. 1317.

If any of the parties desire findings of fact in addition to those made, proposed findings may be submitted to the court within fifteen days.