**BALTIMORE & O. R. CO. et al. v. UNITED STATES et al.**

No. 4681.

District Court, N. D. Ohio, E. D.

Nov. 24, 1933.

Sidney S. Alderman, of Washington, D. C., H. Z. Maxwell, of Philadelphia, Pa., Alfred P. Thom, Jr., of Washington, D. C., and Nye F. Morehouse, of Chicago, Ill., and William N. King, of Cleveland, Ohio (J. Aronson, of New York City, M. L. Bell, of Chicago, Ill., Henry Wolf Bikle, of Philadelphia, Pa., N. S. Brown, of St. Louis, Mo., N. S. Buckingham, of New Haven, Conn., H. W. Clark, of New York City, W. R. C. Cocke, of Norfolk, Va., John J. Cornwell, of Baltimore, Md., Ben C. Dey, of New York City, F. G. Dorety, of St. Paul, Minn., R. V. Fletcher, of Washington, D. C., W. L. Kinter, of Philadelphia, Pa., W. H. Lyford, of Chicago, Ill., D. F. Lyons of St. Paul, Minn., Clarence A. Miller, of Washington, D. C., H. T. Newcomb, of New York City, W. B. Rodman, of Norfolk, Va., Bruce Scott, of Chicago, Ill., H. A. Taylor, of Cleveland, Ohio, and E. J. White, of St. Louis, Mo., of counsel), for petitioners.

Thomas Stevenson, of Cleveland, Ohio (Horn, Weisell, McLaughlin & Lybarger and Harold N. McLaughlin, all of Cleveland, Ohio, of counsel), for interveners.

Elmer B. Collins, Sp. Asst. to Atty. Gen., for the United States.

D. W. Knowlton, Chief Counsel, Interstate Commerce Commission, of Washington, D. C., for the Interstate Commerce Com'n.

Before HICKENLOOPER, Circuit Judge, and WEST and KILLITS, District Judges.

PER CURIAM.

This is a representative action brought by a number of the leading railroads of the United States, and in the interest of substantially all of the steam operated carriers of the country, to enjoin the enforcement by the Interstate Commerce Commission of amendments supplementary to its rule 157, ordered by the commission in January of this year, after a very extensive hearing, and on the joint complaint of the chief engineer of the Brotherhood of Locomotive Engineers, and the president of the Brotherhood of Locomotive Firemen and Enginemen. 190 Interstate Commerce Commission Reports, 351.

The complaint was instituted under the provisions of the Boiler Inspection Act to raise the question of comparative safety between manually and power operated reverse gears on locomotives, and to seek an order compelling the equipment of steam locomotives with power reverse gear, and the substitution on locomotives in use of such gear for the manually operated apparatus thereon employed.

A very extensive fact record, embracing the testimony of hundreds of witnesses familiar with facts underlying the question in contest, was produced. The order sought to be enjoined entails an ultimate expense upon the carriers of between seven and eight million dollars in the changing of gears on more than 20,000 locomotives now in use.

Further recitation of the facts is unnecessary here. Special recital of those particularly involved will be had. Nor does it seem necessary to attempt an elaborate analysis of the very large record and a full discussion of the many reasons advanced by the parties respecting the action of the commission leading to the order complained of.

We consider that the report, 190 I. C. C. 351, adequately meets whatever requirement may exist for a statement of conclusions of fact, in view of section 14 (1), 49 USCA; Lehigh Valley R. Co. v. Clark (C. C. A.) 207 F. 717, 721.

At the threshold of inquiry stands the earnestly contested question whether the Interstate Commerce Commission, hereinafter referred to as the commission, was empowered to entertain, as in this instance, a complaint of employees' organizations seeking an amendment of such rules as are required to be adopted under the Boiler Inspection Act. It is conceded that if jurisdiction in the commission existed to act upon such a complaint, it is to be found only in that act. 45 USCA § 22 et seq.

Were the question one of first impression, and we had nothing before us but the language of the act itself, this court would have difficulty in finding legislative support for the jurisdiction exercised by the commission in this instance, except through a very broad application of the rule of liberal construction. Yet, to refuse such construction to the act, would lead to a conclusion tending to a large degree of frustration of the office of this legislation to effect the purpose of the act as reflected in its title, to which we,

931

of course, may refer in doubtful cases, which reads:

"An Act To promote the safety of employees and travelers upon railroads by compelling common carriers engaged in interstate commerce to equip their locomotives with safe and suitable boilers and appurtenances thereto." 36 Stat. 913.

█ However, from the beginning the commission has exercised the authority now questioned, and in twelve orders prior to July, 1925, amended eighteen of its rules to require improvements in, or installations of, special safety devices on steam locomotives. Then followed the decision of the United States Supreme Court in Napier v. Atlantic Coast Line et al., 272 U. S. 605, 47 S. Ct. 207, 71 L. Ed. 432, in which the question was whether the Boiler Inspection Act had so occupied the field of regulating locomotive equipment so as to preclude state legislation. It is urged on behalf of the plaintiffs here that the opinion in the Napier Case, so far as it touches upon the question of jurisdiction in the commission to entertain such a complaint, is obiter. There is color of justification for this claim, but we are not content to so lightly regard its office. The question before the Supreme Court involved a comprehensive consideration of the force of the Boiler Inspection Act, and the authority of the commission thereunder; so much so that the language of the opinion cannot be regarded by us as merely collateral to the issue there, but rather impellingly applicable as an interpretation of the whole statute as operatable legislation. Advised by it, we find necessity to uphold the jurisdiction of the commission in this specific instance.

In the pleadings, and in the presentation of this case, the fact situation before the commission is comprehensively presented and argued. It is unnecessary to cite extensive authority for the proposition that we have a very narrow opportunity to consider the evidence. The privilege and duty of the commission to function speedily and effectively as an administrative body must be sustained.

█ The general rule controlling us is that we should not weigh evidence, nor consider the wisdom of the commission's action if its determination finds substantial support in the fact record, Chicago, R. I. & P. Ry. v. U. S., 274 U. S. 29, 33, 47 S. Ct. 486, 71 L. Ed. 911; we cannot inquire into the soundness of the reasoning by which its conclusions are reached, nor question the wisdom of regu-

lations prescribed by it. Western Paper Makers' Chem. Co. v. U. S., 271 U. S. 268, 271, 46 S. Ct. 500, 70 L. Ed. 941; Interstate Com. Com. v. Ill. Cent. R. Co., 215 U. S. 452, 471, 30 S. Ct. 155, 54 L. Ed. 280; U. S. v. New River Co., 265 U. S. 533, 542, 44 S. Ct. 610, 68 L. Ed. 1165. But we may regard the fact situation to determine, if it is claimed, whether the commission has acted arbitrarily or inconsiderately in some particular. B. & O. R. R. Co. v. U. S., 264 U. S. 258, 44 S. Ct. 317, 68 L. Ed. 667; Interstate Commerce Commission v. L. & N. R. Co., 227 U. S. 88, 90, 91, 33 S. Ct. 185, 187, 57 L. Ed. 431; U. S. v. Abilene & So. R. Co., 265 U. S. 274, 44 S. Ct. 565, 68 L. Ed. 1016; A., T. & S. F. Ry. Co. v. U. S., 284 U. S. 248, 52 S. Ct. 146, 76 L. Ed. 273.

█ The challenge to scrutinize the fact record within the limitations just alluded to is earnestly made by the petitioners in this case. It cannot be disputed that the commission hearing an issue of the character raised by the complainant, and leading to the order under consideration, sat under the limitations of a judicial body, and became in the process of fact finding virtually a jury bound to use the applicable criteria controlling jurors in the weighing of the probative force of matters of evidence. That the commission is an administrative tribunal "appointed by law and informed by experience" does not differentiate it in this respect from a jury at law. Therefore, here are raised the queries whether the order is supported by substantial evidence, and whether in arriving at its conclusions of fact the commission acted arbitrarily respecting the comparative potentialities of important facts established, and/or by ignoring "the 'indisputable character of the evidence.'" I. C. C. v. Louisville & Nashville R. Co., supra. To refuse to consider pertinent evidence introduced is arbitrary action. Chicago Junction Case, 264 U. S. 258, 267, 44 S. Ct. 317, 68 L. Ed. 667. The distinction between refusal to heed, and palpable neglect to give, substantial evidence the weight it manifestly carries, in casting up the affirmative and negative matters in the testimony, is immaterial—either is arbitrary.

█ Opportunity is at hand, presented by the commission's report, to examine into petitioners' challenge that the commission was arbitrary in the consideration of the case made, and that it arrived at its conclusions through disregarding or ignoring substantial testimony. Petitioners, in their exceptions to the draft report of the examiner, in their motion for findings of fact and in their pe-

tition for reargument, were thorough in directing the attention of the commission to the circumstances which they considered to support these charges. We comment on some thereof, solely because the report affords sufficient illumination, and, in so doing, understand that we have no concern with the reasoning of the commission upon the facts accepted by it, and no right to attempt setting up a judgment as to the issue.

It is urged that the commission refused to apply its own standard respecting the determination of the weight of conflicting testimony that the substance thereof, rather than the volume, should be regarded.

In the Automatic Fire Door Case, 151 I. C. C. 448, the commission said on this point:

"This presents the question whether these minor injuries shall be permitted to preclude the use of an appliance which experience shows has and will prevent injuries much more serious and not infrequently death. The answer is found in the words of one of the defendants' principal witnesses; that is, it does 'not matter how many minor injuries you have you could not have enough of them to counterbalance one death.' "

This applicable and sensible principle was clearly disregarded in the instant case. Here the commission very plainly based its fact finding by tallying, or numbering, the injuries attributable to hand operated gears on the one hand, and power gears on the other; in effect giving the same consideration to a slight or temporary injury as to a serious— even a permanent—injury, when comparing the merits as to the safety of the rival devices. It appears that weight was given to the numbers comparatively, rather than to quality. Oral testimony on the subject of casualties was received from about 100 witnesses, approximately evenly divided between the contending appliances. As we count them, 48 persons were injured on engines equipped with hand gear, and 47 when the gears were power actuated.

Among lever hand geared locomotives there were two casualties producing permanent injury. The rest were much less serious, very many of them comparatively trivial, although there were several hernias and also cases of broken bones. It is surprising how many casualties in cases of hand equipped locomotives flowed from carelessness of position of the operator, carelessness of operation, neglect of proper general maintenance, worn quadrants, and faulty inspection after shopping. At least 18 instances are in evidence in which such indiscretions or neglect were the underlying factor. One engineer on another engine was killed and his fireman injured painfully as the result of a collision where a locomotive equipped with lever hand gearing "got away" from an excitable and somewhat inexperienced engineer, who was relieved from duty therefor. It is quite evident that carelessness is more provocative of untoward results in cases of manual gearing, due to the placing and character of the motivating apparatus, than when the reversing is by the wheel or where power, air, or steam is employed.

Going to engines equipped with power actuated gears, the evidence disclosed nine deaths, several permanent injuries, a fractured skull, involving seventeen months' lay-off, and an award of $10,000, an amputated arm, and eight other cases where the injuries exceeded in severity any of those shown to have occurred on engines equipped with hand apparatus. These eight casualties cost the carriers affected approximately $35,000 in compensation and expenses. The contrast in respect to severity of casualties between the two classifications is exceedingly striking.

Complainants were permitted to supplement their oral testimony by the introduction of 232 copies of "Reverse levers, operating" accident reports (Form T). Of these 190 were in locomotives equipped with hand gears, other than hand screw gears, and not already covered by oral testimony, 11 were in connection with power reverse gears, 3 with hand screw gears. Giving this secondary and documentary testimony the same acceptance enjoyed by oral testimony, although respondents were deprived of the right of cross-examination, the count of physical injuries shown favors the complainants in the approximate ratio of over three to one. But the great preponderance of substantial injuries coming from the use of power gearing continues unaffected by this class of testimony. The 190 injuries shown on the Form T reports, where lever hand gears were used, were minor in character, involving in no instance any permanent disability. In none of them was the injured party off duty more than sixty days, more than two-thirds causing but from four to fifteen days' lay-off. It is urged by the carriers that these Form T reports do not exhaust the number of casualties attributable to power actuated gears, because so many thereof are reported under another classification.

On pages 359, 360 of 190 I. C. C., of the commission's report, it is said:

"The carriers urge that with manually operated reverse gear the presence of an obstruction, such as the arm or the head of a man, could be detected by the resistance offered to movement of the hand lever or wheel, whereas with the power reverse gear this would not be detected. * * * As to the ability to detect an obstruction in the valve gear, such as a man's head or arm, by the resistance offered to movement of the hand reverse gear, in time to avoid injury, we do not think such a theory is sound."

There is something more than theory in this claim. If it is a fact, there is potency in it on the question of comparative safety. Two witnesses operating levers testify to the feeling, one being a case where an engineer's head was the obstruction, and much opinion from men experienced with both kinds of gears. It is also supported by reason—the presence of an obstruction is directly notified to the operator of a lever, whereas the operating wheel simply starts insensate machinery into operation.

Upon the question raised that the commission has ignored its own standard respecting the comparative seriousness of injuries incurred in the two contesting classifications, its report contains this language, with which we cannot concur:

"Counsel upon brief refer to our language in Public Utilities Commission of Ohio v. Pennsylvania R. Co., 151 I. C. C. 448, 464, with reference to the relative importance of serious or fatal injuries. The conclusions here reached in no way conflict with the principle there announced."

■ Continuing from the language above quoted, and as part of its comment on petitioners' criticism, this is said:

"Aside from the evidence of record we can not believe that the carriers would contemplate the continued use of over 29,000 steam locomotives with power reverse gear, and contemplate the application of power reverse gear on new locomotives, if those in charge of the construction and operation of locomotives actually and sincerely believed that power reverse gear is less safe or less efficient than hand-operated reverse gear."

This observation convicts the commission of a clear disregard of undisputed testimony, and of the use, to support its conclusions, of such testimony in violation of its true import. It is uncontradicted that for twenty years or more the carriers have been preferring power operated reversing appliances over hand gear, in more powerful engines, not because the for-

mer are found intrinsically safer, but for the reason that the enlarged boiler capacity, sought for in later engines, restricts very materially cab space, wherefore power gears are now installed for that the cab stationed operating appliance in such gears takes but a fraction of space therein of that necessary for the levers and locking devices of the manual apparatus, and further, in the same direction, because in the restricted cab space less movement of the operator is required to actuate power reverse than in the case of the earlier gears. To use the preference of the carriers, for power. reverse gears, as evidencing insincerity on their part in taking issue with the complainants on the question of comparative safety is inexcusable, under circumstances clearly shown.

■ The same reason, which is seen to be the motivation for preferring power appliances in later practice, has caused the installation in 1,550 locomotives of a hand device, which is operated in the cab by a wheel measurably comparable in form and situation to that used in power devices. The evidence suggests that this sort of manual operation meets every objection offered by the complainants, as illustrated by their evidence touching the causes of almost every accident attributable to manually operated gears. This is shown by the discussion by the commission of the occasion of injuries resulting from the use of hand (lever operated) gears, found on page 356 of 190 I. C. C. of its report, as follows:

"The accidents which have occurred on locomotives equipped with hand reverse gear are attributable to several conditions. On many locomotives the hand lever is located behind the boiler head and at the side of the engineer's seat box. The clearance between the lever and the back board of the cab is frequently very small. In fact, on some locomotives the lever when in extreme backward position extends beyond the back board of the cab, which is cut out to permit the lever to pass. On other locomotives the clearance between the lever and the seat box, as well as between the lever and the boiler head and appurtenances thereon, is very small. Many accidents have occurred, due to engineers and others being caught between the hand reverse lever and the other parts referred to, due to the small clearance. On most locomotives a stop-block or pin is provided near the ends of the quadrant for the purpose of limiting the travel of the reverse lever, so that it will not come in contact with the cab or the boiler and the appurtenances located thereon. If the stop-block is missing or, for any reason, fails

to function, there is in most cases nothing to prevent the lever from coming in contact with the boiler or the cab, and numerous persons have been injured because this condition existed."

It appears from the testimony that during the years 1930 and 1931 but two accidents were reported from these 1,550 locomotives, attributable to the use of this modified hand gear. It is plain that the commission totally disregarded this evidence, and failed to perceive its import as affecting the reasonableness of its classification of power gears on the one hand, and hand operated gears on the other hand, whatever manual apparatus was employed to actuate them. Notwithstanding this testimonial to the comparative safety of the hand screw reverse gear, showing that, at the worst, it is approximately as safe as power reversing gears, and that such apparatus should have been classified with wheel actuated power gears on the issue of comparative safety, the commission arbitrarily rejected that device, and required, by its order, wherever weights on the wheels met the order's conditions, that even this improved device increasing safety to the operator should be removed, and power gears installed.

■ That the commission proceeded on the theory that, on the issue before it, it was concerned only with the safety of engineers and firemen is apparent. This is shown in this quotation from the report (page 355 of 190 I. C. C.):

"The record shows that during the 5-year period from 1925 to 1929, inclusive, there were 1,116 casualties due to reverse gear. The proportion of such casualties occurring on locomotives equipped with hand reverse gear is illustrated by the fact that of 232 cases occurring in 1929 and 1930[1] a total of 216 occurred on locomotives equipped with hand reverse gear and 16 on locomotives equipped with power reverse gear. During the latter period there were about the same number of locomotives in service with power reverse gear as with hand reverse gear."

Such treatment of the fact situation is not justified. Consideration of the question of safety should not be limited to dangers to cab stationed employees only. The object of the Boiler Inspection Act, as expressed in its title, already quoted, is to promote the safety of employees generally and travelers. This conclusion is forced, also, by sensible construction. The evidence shows that, while the

safety of enginemen may be promoted by the use of power gears, eccentricities of operation, outside of the cab, and trickiness of operation due to circumstances arising from the intricacies of the machinery and temporary insufficiencies of the power sought to be used, circumstances undetectable at times, are causative of the most severe and most numerous injuries to employees engaged in the outside care of the locomotive, or about it on other duties, and the same conditions confront, at times, the general public and passengers with the gravest dangers. This is shown by impressive and uncontradicted evidence. The quotation just exhibited advises that the commission, in arriving at the ultimate question, disregarded, without justification, this extremely important factor of consideration, which properly should have weighed substantially against the conclusion which the commission reached.

■ One tendency peculiar to power reverse gears, shown clearly by a large amount of testimony, and met with no contradiction, is that of "creeping"—an unexpected movement of the engine, forward or in reverse, caused by temporary conditions affecting the apparatus which show their presence only in their untoward results.

The term "creeping" is defined in the report (page 360 of 190 I. C. C.) as a "movement of the reversing mechanism as well as the valve gear without the operating lever in the cab having been adjusted, which causes an undesired change in the point at which the admission of steam into the cylinders is cut off." It is shown by much evidence that the tendency to so move unexpectedly is confined to power geared locomotives. How lightly the commission considered the importance of this constituent of the fact situation is shown by this quotation from the same page of the report: "The fault termed 'creeping' causes no accidents and resolves itself largely into a question of proper maintenance." The statement that these movements cause no accidents is inexplicable in the face of its showing that at least one death was so brought about, as well as several severe injuries—in one instance involving total disability. One other death appears, but less clearly, to have been so caused. Several other instances are shown where such movement was very destructive of property, where, fortunately no human was in the path of the locomotive's unexpected movement.

---

[1] This refers to Exhibit 13, Form T Report (Injuries, "Reverse levers, operating"), already discussed, which covered only 190 cases, as actually shown by the report, not already in by oral testimony, and dealing with lever operating devices.

The commission's thought that "if the power reverse gears are properly maintained * * * 'creeping' to any material extent will be eliminated," and that the question is one of "proper maintenance," is applicable, with the same force, to conditions, exhibited as causal, producing casualties occurring in usage of hand gears; for instance, the cases where a lever latch jumped the quadrant notch in which it was seated, the movement invited because the quadrant teeth had become worn into a rounded condition. The testimony is ample and without contradiction that hand gears, because more simple in construction, are more quickly responsive to the operator's appliance, in cases of emergency.

The commission states (report, 190 I. C. C. 353) that 30,038 locomotives, equipped with hand gear, were under inspection at the time of hearing. It also refers to Exhibit 13 (Form T Reports) which total 232 casualties alleged to be due to reverse gear operations for the years 1929 and 1930. An analysis of these reports is given the court, the accuracy of which is not disputed. This shows at least 24 which are not attributable to actual operating lever worked gears. The result is that in two years operating casualties calling for Form T reports among 30,038 hand gear equipped locomotives were 208 in number— an average of one casualty, trivial or serious, in two years, to 144 locomotives, or, in one year, one to 288 locomotives.

The evidence also exhibits, very clearly, a fact which we can consider without trenching on the doctrine that we must leave preponderance as the commission found it, namely, that the testimony so approaches an equilibrium on the vital question that the placing of the preponderance is a matter of considerable deliberation.

Power reverse gears have been known and in use for more than twenty years. Hand actuated gearing devices are very much older. As rivals for distinction as involving less "unnecessary peril to life or limb" they were operated side by side, for nearly a quarter of a century, before it was thought worth while to make the debatable question subject of formal investigation, and then, the record discloses, the very employees whose safety was directly involved, are found so divided in two camps that a very formidable minority disagree with the commission's conclusions.

In a hazardous occupation, one casualty, indifferently serious or trivial, occurring in a year in a group of 288 locomotives, does not suggest a very seriously existent "peril to life or limb." Also the question of comparative

peril, between the use of one class of devices and that of another, each involving hazards, is not observable to be itself very imperative of solution, when reaching a decision requires grave consideration of a large volume of evidence to be weighed in sensitive scales that a preponderance be ascertainable.

The foregoing discussion would, perhaps, be inept if it were not for a record situation to which it becomes pertinent.

In their answer, dated January 29, 1931, before the commission the petitioners said:

"As is well known to this honorable Commission, the carriers are in no position at this time to be put to the necessity of increased expenses or to make expenditures which are not essential. Part of this is due to the general, world-wide depression in business, which it is hoped will be temporary, but a large part of the depleted condition of their revenues is due to the effects of competition by other agencies of transportation, largely if not entirely unregulated, and at least a substantial part of this competition is likely to be permanent. At a time when it is necessary to make a survey of the entire railroad situation and to adopt every means that is wise and suitable to enable them to continue to furnish adequate transportation to the public, it is believed that it will be unfortunate and against the public interest to create for them necessities for expenditures which can be avoided compatibly with adequate and economical service to the public and proper protection to the employees, as is the case here. To grant the prayer of the petition in this case would involve the expenditure of a very large amount of money. The expenditure of any amounts that are in any case available may be, and are now being, made in other directions which will promote the public and employee welfare and safety in a very much larger degree than that proposed in the complaint.

"The employees constitute an integral and essential part of the industry conducted by these respondents, and it is to their interest, as well as to the interest of the security holders of these respondents and of the general public, that expenditures not pressingly necessary should not be required of the carriers at this juncture."

The position then taken has been consistently maintained—last presented for the commission's consideration in the carriers' petition for rehearing in February last which was denied. That it was supported, in January, 1931, by cogent facts so notorious as to be well within judicial notice, A., T. & S.

F. Ry. v. U. S., 284 U. S. 248, 52 S. Ct. 146, 76 L. Ed. 273, is very clear, and it was directly a matter of proof of the most serious kind. That, in January, 1933, when the order was made, the financial situation of the carriers had become much more difficult, and that the effective competition of truck, bus, automobile, and aeroplane had greatly intensified were also facts within judicial knowledge— indeed matters of which the commission, more or less officially, was cognizant.

The commission's response to this part of carriers' defense is:

"Nor are we unmindful of the financial condition of the carriers, which was strongly urged as a reason for denial of the relief here sought. But we can not believe the present financial condition will be permanent and we are convinced that action should now be initiated to afford relief in the future from the conditions complained of." (190 I. C. C. 361).

The very serious effect of new competition, plainly increasingly embarrassing throughout 1931–32, and which should be considered as a presently effective, and steadily growing obstruction to recovery of the carriers from their financial troubles, even if the prevailing general depressed conditions should improve, apparently the commission ignored altogether, although it should have occurred to that body that, to meet, in any substantial degree, that competition, abandonment of a large amount of equipment, especially traction, would be necessary, followed by unusually large expenditures for effective substitution of new types.

The plain deduction from the report is that the issue of comparative safety before the commission in 1931 was not exigent, having lasted then for years. In fact it was diminishing in importance, because of obsolescence of locomotives equipped with hand gears, and, further, because of the sure prospect of important changes in traction equipment. But the question of financing the change demanded by complainants was pressing and highly important. In this, as the defendants answered, the employees themselves had a large interest. For rehabilitation, replacements, and proper maintenance, not only for the effective continuance of the carriers' public duties, but obligatory to preserve a reasonable degree of safety to employees generally, was at least as pressing a duty upon the carriers as to secure the effect at which the order was directed. Under these circumstances we feel that the commission was inconsiderate to the extent of inexcusable neglect in passing over, so lightly, a plea of financial distress to which it should have given the most serious attention. City of Lowell v. R. R., 238 Mass. 328, 130 N. E. 638.

Epitomizing what has already been said —the commission was bound to give legal effect to facts established in evidence, Oregon R. & N. Co. v. Fairchild, 224 U. S. 510, 525, 32 S. Ct. 535, 56 L. Ed. 863; its order should be set aside if disregard by it is shown of substantial and uncontradicted evidence having a bearing upon the issue, S. W. Bell Tel. Co. v. Public Service Commission, 262 U. S. 276, 287, 43 S. Ct. 544, 67 L. Ed. 981, 31 A. L. R. 807; and to refuse to consider pertinent and substantial evidence is considered arbitrary action, sufficient to set aside its order, Chicago Junction Case, supra.

The doctrine that this court cannot question the conclusion at which the commission arrives if that is sustained by substantial testimony follows the presumption that the triers of fact have fairly considered all of the pertinent testimony offered by the parties, and, that, in so doing, have applied the same criteria in determining the probative quality and force of evidence from each side. When this presumption is negatived in the record, the rule must fail—otherwise it would be a shield for arbitrary or inconsiderate action.

We need not prolong this discussion by considering other specifications of the defendants. The commission's attitude, as reflected by its report in the instances we have considered, calls for the application here of the principles above stated. We find that attitude to have been so arbitrary and so regardless of its duty to fairly consider all of the pertinent and substantial facts established before it that we should restrain the enforcement of the order complained of. So directed.