By the Couet.
 

 Valuation Including Peice Teends.
 

 As of the date certain of June 30, 1925, the commission fixed the tentative valuation of the company’s property at $104,282,735. Subsequently this was reduced $10,575,247. Item by item the company complains about the commission’s figures such as those relating to right of way, land, buildings, central office equipment, distributing system, undistributed construction costs, going concern value and construction work in progress. However, a laborious study of the superabundant record of approximately 70,000 pages discloses a sharp conflict of competent evidence on every point, and under such circumstances this court cannot properly hold that the findings of the commission are against the weight of the evidence. Illustrative of this fact is the matter of intangible, undistributed construction expenditures. One witness expressed tfie
 
 *582
 
 opinion that the allowance for this item should be approximately $19,088,000; another that it should be $18,525,000; another that it should be $16,000,000; and still another that it should be $12,000,000. The commission after hearing and seeing the witnesses allowed $12,650,143. Certainly this court is at least in no better position to appraise the value of this conflicting testimony.
 

 It is contended that there was failure to consider certain vital elements in determining questions of valuation. For instance, the claim is made that the commission excluded from the property value money necessarily invested in construction work which was in progress, in an average annual amount of $3,000,000 for the nine-year period.
 

 The commission held that no allowance could be included for this work in determining value for rate-making purposes, because the property was not complete and ready for service and therefore not used and useful property in the service of the public within the meaning of Sections 499-8, 499-9, 614-20 and 614-23, General Code. An allowance was made, however, for the item of interest during construction, which fully and adequately compensated the company for the use of its capital which was invested in unfinished construction work, and the amount of allowance so made entered into the rate base which was fixed by the commission. Furthermore, allowance was made for capital so invested as soon as the new construction came into use, and provision was also made for the capitalization of materials used in construction and inventories on hand before they were used in the process of construction.
 

 It is also contended that no consideration was given to the cost of property and the cost of reproduction of property. It may be conceded that such costs are relevant facts to be considered in determining values.
 
 Los Angeles Gas & Electric Corp.
 
 v.
 
 Ry. Comm. of Cali
 
 
 *583
 

 fornia,
 
 289 U. S., 287, 306, 77 L. Ed., 1180, 53 S. Ct., 637.
 

 In support of its contention that cost of property was ignored, the company offered a table which purports to show cost of the company’s intrastate property aside from construction work in progress, and similar facts. But there is nothing in the record to show that the evidence so offered was not considered, along with the other evidence in the case relating to cost, in determining the rate basis.
 

 As to the claim that the commission- did not consider cost of reproducing property, the record discloses that evidence was adduced relating thereto and there is entire absence of a showing anywhere in the record that the commission failed to give proper consideration to such evidence bearing upon the question of expense of reproducing essential property.
 

 A careful consideration of all claims of the company relating to alleged omissions or failure to consider certain elements of value discloses that the contentions are not borne out by the record. In fact, it appears that the commission determined its rate base from all the evidence before it, including that relating to these alleged ignored items, and thus reached the conclusion it did relative to the basic valuation fixed for determining a fair and reasonable rate.
 

 Likewise the company strenuously complains because, although neither side introduced evidence of price trends, the commission took judicial notice of such trends; but even a casual examination of the decisions of the United States Supreme Court unquestionably discloses definite and repeated sanction of this principle.
 

 In the case of
 
 Central Kentucky Natural Gas Co.
 
 v.
 
 Railroad Commission of Kentucky,
 
 290 U. S., 264, 78 L. Ed., 307, 54 S. Ct., 154, Mr. Justice Stone stated that one ground for reversal of the judgment of the lower court was its exclusion “from consideration the
 
 *584
 
 profound changes in values, costs of service, consumption- of commodities and reasonable return on invested capital which we judicially know took place during the period of more than five years while the case was pending before the Commission and the Court.” Then in the ninth paragraph of the headnotes of that case, as reported in 78 L. Ed., appears the statement that “judicial notice may be taken of changes in values, cost of service, consumption of commodities and reasonable return on invested capital which have taken place during the period while a case was pending before the Utilities Commission and the Court.”
 

 In the later case of
 
 Dayton Power & Light Co.
 
 v.
 
 Public Utilities Commission of Ohio,
 
 292 U. S., 290, 78 L. Ed., 1267, 54 S. Ct., 647, Mr. Justice Cardozo said that “in view of business conditions, of which we take judicial notice, * * * the rate allowed was adequate.” Then in the twenty-fourth paragraph of the headnotes of that case in 78 L. Ed., it is stated that “the Supreme Court of the United States takes judicial notice of business conditions.”
 

 In the
 
 Dayton case, supra,
 
 Mr. Justice Cardozo cites the case of
 
 Atchison, Topeka & Santa Fe Ry. Co.
 
 v.
 
 United States,
 
 284 U. S., 248, 76 L. Ed., 273, 52 S. Ct., 146, in which Mr. Chief Justice Hughes said that “There can be no question as to the change in conditions upon which the new hearing was asked. Of that change we may take judicial notice.” Then in the second paragraph of the headnotes of the case in 76 L. Ed., appears the statement that “the Court may take judicial notice of a general economic depression. ’ ’
 

 In view of these authorities it is readily apparent that the commission committed no error in this respect.
 

 Operating Expenses.
 

 In the matter of operating expenses, the commission apparently accepted and applied the testimony of the company in the consideration and determination pf
 
 *585
 
 most of the items involved. That was true as to the very important item covering cost of current maintenance, including salaries, in which there was no reduction whatever from the claims of .the company.
 

 We shall refer particularly to the amount urged by the company for allowance for license contract services. These charges were seriously challenged by the commission. They have reference to certain services furnished the Ohio Bell Telephone Company by the American Telephone
 
 &
 
 Telegraph Company and other associated companies, compensation for which was computed at a stated per cent of the gross revenues.
 

 Such license contract provides that the licensee was to receive from the licensor in addition to all other services and benefits accruing to the licensee, the described services and privileges which have been briefly summarized as follows: (a) The right to use all telephonic devices covered by patents owned by the licensor and all new improved apparatus in the art of telephony resulting from experimental work under the direction of the licensor, and protection against all suits for infringement, (b) The continuous prosecution by the licensor of research work in the development of the art and the plans designed to promote economy and efficiency in equipment of the plant of the associated companies, (c) Advice in engineering, traffic, operating, commercial, accounting, patents, legal, administrative and other matters pertaining to the successful conduct of the telephone business, (d) Advice and assistance in any financing required to be done by the licensee in the extension of its plant or improvement to its system, and assistance in marketing licensee securities and other necessary financial support, (e) The right to extend to subscribers of the licensee the connections provided between its system and the system of other associated companies and their subscribers, (f) Active assistance in connection with
 
 *586
 
 such measures as will best protect the health of employees and in other ways conserve the high quality of service and maintenance by the licensor of various pension and insurance plans, (g) the right of the licensee to extend to its connecting companies the benefit of the advice and information that the licensee may receive from the licensor.
 

 In order that the services may be promptly performed the licensor was to (a) Render available for use of the Bell Company all products of the licensor’s research and all inventions, etc., relating to the art of telephony, which, after investigation, are pronounced by the technical experts of the licensor to be of practical use. (b) Maintain continuously an organization of specialists to relieve the licensee from the necessity of performing such work, (c) Maintain facilities for connection between the system of the licensee and the system of other associated companies.
 

 The contract provides for full service between the exchange of the licensee and the toll lines of the licensor setting out provisions for payment of interline service.
 

 The company classifies the costs for services claimed to have been rendered, but which were rejected in whole or in part by the commission, in the following departments: Development and research; information; personnel; public relations; treasurer’s; comptroller’s; secretary’s; administration and general service; operations; depreciation of telephone instruments; contingent liability for patent infringement.
 

 The commission was of the opinion that valuable service was rendered the Ohio Bell Telephone Company by the American Telephone & Telegraph Company, which concededly is the parent corporation, and that a substantial portion of the payments claimed to have been made to defray the costs of the parent company in providing such service should be, and they
 
 *587
 
 were, accordingly, allowed. It found, however, that a portion of the payments so claimed resulted in no benefit to the Ohio Bell Telephone Company and should not be included as a part of its operating expenses. In view of the uncertain and indefinite character of the proof based in great measure upon estimate and opinion, if not conjecture, it cannot be said that the findings and conclusions of the commission were unfair or unreasonable, and certainly there is no basis for finding that they were unlawful.
 

 The commission followed the admonition of the Supreme Court of the United States in the Illinois proceeding reported in
 
 Smith et al., Commerce Comm.,
 
 v.
 
 Illinois Bell Telephone Co.,
 
 282 U. S., 133, 75 L. Ed., 255, 51 S. Ct., 65, and
 
 Lindheimer et al., Commerce Comm.,
 
 v.
 
 Illinois Bell Telephone Co.,
 
 292 U. S., 151, 78 L. Ed., 1182, 54 S. Ct., 658, and endeavored to ascertain the cost to the American Telephone & Telegraph Company of the service furnished by it to the Ohio Bell Telephone Company. It did not and was not bound to accept fully and unconditionally the statements of the company as to the amount claimed to have been paid to the parent company; nor was it conr eluded thereby as to the reasonableness or propriety of such service,- nor bound to regard the amount paid as the true value of such service to the Ohio Bell Telephone Company. Just as in other respects, its findings and conclusions upon these items will not be disturbed unless shown to be manifestly against the weight of the evidence or in contravention of law.
 

 For instance, the commission allowed the claim for engineering service in its entirety. On the other hand, it denied in its entirety the claim made for services rendered in its information department, it having found that the general advertising of the American company, national in scope, did not relate to the Ohio
 
 *588
 
 Bell Company as such, and that such general advertising should not be paid by the Ohio telephone users.
 

 The commission found that the department of development and research did much for the benefit of the associated companies. It rejected some of the costs and expenses claimed because not related to Ohio Bell Telephone operations. These charges were for television, radio, submarine, cable and other similar items.
 

 In the so-called personnel department, many items of cost were allowed as claimed, those disallowed having been found rather in the interest of the holding company than of the licensee and hence not proper charges against the rate payer of the operating company.
 

 So also as to the public relations department, the commission found that no part of such cost should be considered in determining the rate to be paid by the Ohio telephone user for the same reason.
 

 The partial disallowance of the charges made for the treasurer’s and comptroller’s departments," and the total disallowance of the charges of the secretary’s department and the department of operations, were likewise based upon its finding that those services were solely for the benefit of the parent company. The so-called general service bureau is referred to as a coordinating department in which general administration costs were included. It seems to be a sort of catchall for items that might possibly have been omitted from some classification.' The allocation was uncertain and unsatisfactory. The commission was probably about right when it allowed half of the amount claimed. The same may be said of its allowance for depreciation of telephone instruments.
 

 It does not appear how there could be justification for a specific allowance for contingent liability for patent infringements, for it does not appear that there
 
 *589
 
 lias been any actual cost to the American company in the way of loss or damage because of patent infringe^ ments of apparatus used by the Ohio Bell Telephone Company, and the mere possibility is too remote and speculative to warrant a charge against the telephone user. So the commission found, and their finding seems commendable.
 

 We deem it unnecessary to discuss in detail each of these specific claims of expenditure for service rendered by the parent company. Suffice to say that from an examination thereof we are of the opinion that the conclusions reached by the commission were just and the allowances made fair and reasonable, and hence should not be disturbed.
 

 The item, expense of depreciation, was recognized by the commission as a legitimate part of the operating costs. The elements of maintenance and of essential replacements were regarded as factors, and it was conceded that the telephone user must, as part of his rate, provide funds to meet the wear and tear upon the physical plant resulting from the year’s operations, and such expense entered into the calculations of the commission, as disclosed by its detailed findings. Its findings and conclusions thereon were apparently reached after careful consideration of the volume of testimony introduced and record evidence placed before it, and we find no warrant for their disapproval.
 

 Depreciation.
 

 The commission makes the unchallenged statement in its brief that “With the exception of the amounts claimed by the company for the expense of depreciation, license contract costs and Western Electric purchases chargeable to expense, the commission allowed without question all of the operating expenses contended for by the company.”
 

 There are two sections of the General Code of Ohio
 
 *590
 
 expressly dealing with the subject of “depreciation” in relation to public utilities.
 

 Section 614-49, General Code, provides: “Every public utility shall carry a proper and adequate depreciation or deferred maintenance account, whenever the commission after investigation shall determine that a depreciation account can be reasonably required. The commission shall ascertain, determine and prescribe what are proper and adequate charges for depreciation of the several classes of property for each public utility. The charge for depreciation shall be such as will provide the amount required over and above the cost and expense of maintenance to keep the property of the public utility in a state of efficiency corresponding to the progress of the art or industry. The commission may prescribe such changes in such charges for depreciation from time to time as it may find necessary.”
 

 It is further provided, in Section 614-50, General Code, that “The moneys for depreciation charges thus provided for shall be set aside out of the earnings and carried as a depreciation fund. The moneys in such fund may be expended in new construction, extensions or additions to the property of the public utility, or invested, and if invested, the income from the investment shall also be carried in the depreciation fund. Such fund and the proceeds thereof, may be used for the purpose of renewing, restoring, replacing or substituting depreciated property in order to keep the plant in a state of efficiency. Such fund and the pro» ceeds or income therefrom shall be used for no purpose other than as provided in this section, except upon the approval of the commission.”
 

 In the case of
 
 Lindheimer
 
 v.
 
 Illinois Bell Telephone Co., supra,
 
 Mr. Chief Justice Hughes succinctly defines “depreciation” as “the loss, not restored by current maintenance, which is due to all the factors causing the ultimate retirement of the property. These
 
 *591
 
 factors embrace wear and tear, decay, inadequacy, and obsolescence.”
 

 Upon the merger or consolidation of September 21, 1921, the company began business with property having a book value of $77,839,932 and a depreciable value of $69,070,160. Several additional properties of considerably smaller valuation were acquired afterwards. With perhaps one exception they were taken over at net cost, with no reserve for accrued depreciation or amortization.
 

 The commission found that from the date of merger the company pursued the policy of keeping its property in good condition and in a high state of efficiency, expending for current maintenance and repairs from the time of merger to the date certain, viz., June 30, 1925, the sum of $16,385,139, and from the date certain to December 31, 1931, the further sum of $42,064,639, which the commission denoted as liberal.
 

 While expending the sums mentioned for current maintenance and repairs, the company’s net charges to reserve for depreciation from the date of merger to the date certain were $11,349,664, and from the date certain to December 31, 1931, amounted to $40,956,301.
 

 As is pointed out in the
 
 Lindheimer case,’supra,
 
 it is extremely difficult as a practical matter to draw a definite line between funds accredited to current maintenance and repairs and those allocated to depreciation. It stands to reason that when proportionately large amounts are expended in maintaining the plant of a public utility in a high state of efficiency aiid good condition, the amount necessary for depreciation expense should be correspondingly less.
 
 Pioneer Telephone & Telegraph Co.
 
 v.
 
 State,
 
 64 Okla., 304, 167 P., 995, L. R. A., 1918C, 138.
 

 In view of our future remarks on the subject of depreciation as it pertains to this case, it would now seem appropriate to call attention to certain pronouncements of the Supreme Court of the United
 
 *592
 
 States in the
 
 Lindheimer
 
 case,
 
 supra.
 
 It was there said in substance that where a public utility complains that rates ordered by a regulatory body are confiscatory, the utility “has the burden of making a convincing showing that the amounts it has charged to operating expenses for depreciation have not been excessive, ’ ’ and that since charges to depreciation should be representative of the expense occasioned to the public utility by the using of physical property employed as fixed capital, excessive charges for such object have the wrongful and indefensible effect of requiring patrons to provide capital contributions, not to make good losses incurred by the utility in the service rendered and thus keep its investment unimpaired, but to secure additional plant and equipment upon which the utility expects a return.
 

 Since in the instant case the amounts charged to depreciation were included in the rates imposed against the company’s subscribers, the commission felt obligated to investigate the matter of depreciation from the date of merger through the year 1933, to arrive at a fair and just result.
 

 There can be little argument that when the consolidation of 1921 occurred, and upon the acquisition of additional properties, the company should have provided from capital contributions or charged to surplus the amount necessary to replace worn out, obsolete and useless units.
 

 From evidence presented the commission found that at the date of merger the company’s property was actually in a per cent condition approximating 83 per cent, which required a depreciation reserve of $14,638,870, but that with depreciable fixed capital of $69,049,424, a depreciation reserve of only $6,219,829 was supplied, according the property an erroneous per cent condition of about 91 per cent.
 

 While admittedly the company made extensive replacements and improvements between 1921 and 1925,
 
 *593
 
 with an annual increase in depreciation reserve, the per cent condition, according to the company’s records, steadily declined, reaching a low of 87.51 per cent on the date certain.
 

 Obviously, this presented an extraordinary situation and suggested to the commission that the charges to depreciation reserve during the initial years of the company’s existence were in excess of the inadequate amount furnished for depreciation at the date of merger, and that in order to sustain a credit balance in the depreciation reserve to make good the original deficiency, the company included excessive amounts for depreciation in its charges to current operating expenses, which were reflected in the rates to subscribers.
 

 In support of this conclusion, the commission engaged in an elaborate set of calculations covering the period from September 21, 1921, through 1933, included in its brief in tabulated form.
 

 This table purports to show that from September 21, 1921, through the year 1924 the company retired its original depreciable plant to the extent of a net realized depreciation of $8,479,728, which indicated too much retirement in too short a time, in light of the erroneous 91 per cent condition accorded the depreciable property by virtue of the insufficient depreciation reserve set up in the beginning.
 

 Upon computations extending through 1933 the commission found that the total charges against the reserve for depreciation were $59,339,088, of which $38,270,252 was covered by the additions to the reserve since September 21, 1921, $6,219,829 was covered by the reserve in existence as of September 21, 1921, and $14,849,007 was representative of the- amount of realized depreciation in excess of the credits which had been made to the depreciation reserve on the assets replaced.
 

 Under a maze of figures, the continuation of which
 
 *594
 
 would but lend to confusion, the commission contended that the company should have begun operations with additional reserve for depreciation of $14,849,007, or that this amount should have been charged to surplus.
 

 On the basis of “per cent condition,” the commission determined that the company’s initial reserve for depreciation should have been $14,638,870, instead of $6,219,829. Such discrepancy resulted in the elimination of the difference, viz., $8,419,041, as charges against the depreciation reserve, representing as it did losses antedating the merger, and which the company had charged to operating costs thereafter, at the expense of its subscribers.
 

 Thus, the commission was unable to escape the conclusion that the company had commenced business with a grossly inadequate depreciation reserve, and that this deficiency together with appreciable replacements and changes made necessary by consolidation, which should have been contributed by capital or taken from surplus were financed by abnormal depreciation charges and corresponding credits to the depreciation reserve during twelve and one-quarter years of the company’s existence, and especially up to and including the year 1931.
 

 Substantiating its findings that the company from its beginning had created an excessive reserve for depreciation to absorb the amount which should have been furnished at the start, the commission points out in its brief that from 1922 through 1931 the company’s composite depreciation rate ranged from 5.68 per cent to 5.92 per cent, but that it was voluntarily reduced in 1932 to 4.50 per cent, and to 4.18 per cent in 1933, thus tending to show final absorption of the deficiency in the depreciation reserve during the year 1931.
 

 After digesting the mass of evidence presented to it on the question of depreciation, the ultimate function of the commission was to fix a composite rate to be
 
 *595
 
 applied annually from the year 1925 to maintain a proper depreciation reserve.
 

 It is to be remembered that the commission did not challenge the charges of the company for maintenance and repairs, which were generous, or any depreciation expense except the major item relating to telephone plant and equipment. Neither did it disturb the depreciation expense charged between September 21, 1921, and the year 1925, which was found to be excessive. The future was its concern in the light of what had transpired in the past.
 

 Proceeding to fix the annual composite rate for depreciation expense, effective from 1925, the commission found that from the date of merger to the date certain the company annually charged as depreciation expense an average composite rate of 5.50 per cent, and that its net charges to reserve for depreciation during the same time were equal to an annual composite rate of 3.74 per cent.
 

 Taking into consideration the substantial sums spent by the company in the years preceding and following the date certain for maintenance and repairs, and that the depreciable property of the company was in a good, improved and up-to-date condition as of June 30, 1925, the commission decided that a composite rate of 4 per cent was just and fair to provide for annual statutory depreciation, and that it, should be applied from 1925 forward.
 

 It appears in the case of
 
 Michigan Public Utilities Commission
 
 v.
 
 Michigan State Telephone Co.,
 
 228 Mich., 658, 200 N. W., 749, that the commission had fixed a rate of depreciation at four per cent of the total fair value of the company’s depreciable property. The Supreme Court of Michigan in upholding such action said:
 

 “Probably in a majority of the cases a higher rate has been sustained. But this is a question of fact depending largely upon the character, nature and age of
 
 *596
 
 the property in question, and illuminated somewhat by the experience of the company respecting the subject. And it must not be overlooked that, as the cases show, many minor replacements, and repairs and maintenance are made and charged to operating expense. In practice, this contributes considerably toward keeping the property intact. The commission- in its opinion * * * reviews the question at length, and states fully the experience of the company respecting the rate of depreciation and the accumulation of the fund. The rate fixed is comparatively low, but, in the light of the facts of this case, we must decline to hold it confiscatory.”
 

 As authority for the proposition that the past experience of a public utility affords a tenable foundation upon which to establish the rate that should be allowed in the future for annual depreciation, the commission relied on the case of
 
 Smith
 
 v.
 
 Illinois Bell Telephone Co., supra.
 

 The value of the company’s depreciable property having been fixed at $84,330,894 as of the date certain, the amount allowed for depreciation expense for the year 1925 at 4 per cent was $3,373,236. The commission further prescribed that depreciation expense for subsequent years should be based on the determined value of the depreciable property at the date certain plus net additions thereto. Consequently, from the years 1925 to 1933, inclusive, the depreciation allowance to the company under the commission’s order amounted to $45,266,614, being some $17,267,353 less than claimed by the company upon higher composite rates and higher valuation, which it contends are reasonable.
 

 Naturally, the company registers vigorous protest to the methods pursued by the commission, arguing that it had no right to rest its calculations on the period preceding the date certain, disregarding the actual retirement losses of the company during the time for which refunds were ordered. The company
 
 *597
 
 earnestly maintains that its actual realized retirement losses from 1925 to 1933, inclusive, were $8,364,256, and that its true expense of depreciation during such time was some $16,000,000, which no one disputes, and that they have been entirely ignored through the erroneous course adopted by the commission; to which the commission replies that if the company had commenced business with a proper depreciation reserve of $14,-638,870 instead of $6,219,829, and if certain properties acquired since September 21,1921, had had reasonable depreciation reserves, the company would have had an ample reserve on December 31,19.33, of $14,652,468.
 

 The conflict between the company and the commission is apparent. The former insists that computations should be confined to the period between 1925 and 1933, while the latter has seen fit to extend its inquiry to the beginning of the company’s existence.
 

 “Depreciation” is inherently a complex subject. It becomes more so when the particular enterprise under consideration is of great magnitude and millions of dollars are involved. In weighing and dissecting the evidence, a knowledge of law plays a minor part. One attempting a comprehensive grasp of the intricacies presented should be both a skilled engineer and a competent accountant, versed in the problems peculiar to the public utilities field.
 

 We have made a conscientious examination of the voluminous evidence relating to “depreciation” and have analyzed it to the best of our ability with regard ■ to the conflicting contentions of the adverse parties. There being substantial support for the findings and order of the commission on this feature of the case, they will be permitted to stand.
 

 Rate oe Return.
 

 The company complains that the rate of return allowed by the commission is inadequate and confiscatory. The rates of return allowed by the commis
 
 *598
 
 sion are as follows: 7 per cent for the years 1925 to 1929, inclusive; 6% per cent for each of the years 1930 and 1931; and 5% per cent for each of the years 1932 and 1933. These rates they find and declare were ample in the light of the economic conditions existing during the periods involved. A rather recent case dealing with this'question is that of
 
 Illinois Bell Telephone Co.
 
 v.
 
 Gilbert,
 
 3 F. Supp., 595, in which there is a discussion of the question quite timely and appropri: ate to the case before us. From that case we quote the following:
 

 “A public utility enjoying the advantages of plaintiff is not entitled to the large earnings made by many undertakings during periods of great prosperity. On the other hand, its return in times of business adversity should not be reduced to the extent that the earnings of many private corporations have been impaired. The range of from 7% per cent to 5% per cent as found in this case gives weight, in our opinion, to all of the elements which under the ruling of the Supreme Court we are required to consider.”
 

 The court took- judicial notice of the general decline in corporate earnings during the years 1931 and 1932 and said: “It is for this reason that we have fixed 6% per cent as the proper rate of return for 1931 and 5% per cent as the proper rate of return for 1932.”
 

 In
 
 Dayton P. & L. Co.
 
 v.
 
 Public Utilities Commission, supra,
 
 the Supreme Court of the United States, on page 311, in approving as adequate a rate of return of 6% per cent, said: “In view of business conditions, of which we take judicial notice
 
 (Atchison, Topeka & Santa Fe Ry. Co.
 
 v.
 
 United States,
 
 284 U. S., 248, 260), the rate allowed was adequate. ’ ’
 

 A rate of return deemed reasonable under generally prevailing normal economic conditions may be excessive in a period of economic depression, and a rate of return deemed reasonable in a period of depression may be wholly inadequate and confiscatory in a period
 
 *599
 
 of general prosperity. That a general economic depression prevailed during the years here considered requires no proof, and this court will, even as the Supreme Court of the United States did
 
 {supra),
 
 take judicial notice of that fact. The fact that the prevailing economic depression is reflected in a reduction in the rate of the return allowed to a utility does not necessarily render the rate of return allowed confiscatory where the reduction made is reasonable in the light of prevailing conditions.
 

 Another recent case in point, decided in February, 1925, is
 
 Chesapeake & Potomac Telephone Co.
 
 v.
 
 Whitman,
 
 3 F. (2d), 938, wherein the court approved a 6 per cent return on the value of the telephone company property, and held that since the telephone company was an integral part of a nation-wide system and was assisted in its financing by the corporation controlling it, the rate of return allowed was not confiscatory. The court, on page 954, said: “* * * If the present company stood alone, either in the sense that it had, unaided, to look after its own financing, or that it did not form what is in reality an integral part of a nationwide system we might well doubt whether a return of 6 per cent would be sufficient to enable it to raise the money necessary to its growth, and therefore, it may be, to its life; but such is not the case. It is owned and altogether controlled by the American Telephone & Telegraph Company, hereinafter styled the National company. In partial return for a substantial annual sum paid by it to the National company, the latter has agreed to assist it in its financing. * * * All that we hold is that, if the company be allowed as much as 6 per cent, its property has not been confiscated. * * *”
 

 In the instant case, the commission, in its opinion, finds that the company “enjoys a virtual monopoly in the territory in which it operates; its business constitutes one of the most substantial and profitable utility
 
 *600
 
 businesses in the state; its properties are favorably located in serving many of the large and thriving communities of Ohio; its management is of a high grade of efficiency; its financial position, because of its subsidiary character, is of a very high order, and it has been able by reason thereof to secure funds for its additions and betterments without going into the open market for money and there is no indication that it will be. required to enter the public market for finances in the immediate future. It may be said the element of risk to the investor as applied to this company is negligible.”
 

 In
 
 Smith
 
 v.
 
 Illinois Bell Telephone Co., supra,
 
 the court, on pages 160, 161, said: “* * * Jn determining what is a confiscatory regulation of rates, it is necessary to consider the actual effect of the rates imposed in the light of the utility’s situation, its requirements and opportunities. As was said in
 
 United Railways
 
 v.
 
 West,
 
 280 U. S. 234, 249, 250 [74 L. Ed. 390, 408, 50 S. Ct. 123], a rule as to the rate of return can not be laid down which would apply uniformly to all sorts of utilities ; ‘what may be a fair return for one may be inadequate for another, depending upon circumstances, locality and risk.’ In that case the court restated the general rule in the language of the opinion in
 
 Bluefield [Water Works & Improvement Co.]
 
 v.
 
 Public Service Commission,
 
 262 U. S. 679, 692, 693 [67 L. Ed. 1176, 1182, 1183, 43 8. Ct. 675], as follows: ‘What annual rate will constitute just compensation depends upon many circumstances and must be determined by the exercise of a fair and enlightened judgment, having regard to all relevant facts. A public utility is entitled to such rates as will permit it to earn a return on the value of the property which it employs for the convenience of the public equal to that generally being made at the same time and in the same general part of the country on investments in other business undertakings which
 
 *601
 
 are attended by corresponding risks and uncertainties; but it has no constitutional right to profits such as are realized or anticipated in highly profitable enterprises or speculative ventures. The return should be reasonably sufficient to assure confidence in the financial soundness of the utility and should be adequate, under efficient and economical management, to maintain and support its credit and enable it to raise the money necessary for the proper discharge of its public'duties. ’
 

 “It is evident that in the present case we are not dealing with an ordinary public utility company, but with one that is part of a large system organized for the purpose of maintaining the credit of the constituent companies and securing their efficient and economical management.”
 

 In the case of
 
 Wabash Valley Electric Co.
 
 v.
 
 Young,
 
 287 U. S., 488, 77 L. Ed., 447, 53 S. Ct., 234, the court held that a rate of return of 7 per cent for a public utility company supplying electricity would not be deemed so inadequate as to amount to a taking of property without due' process because after taking care of debts and dividends there might be nothing left for surplus, where it appeared that the company had a surplus equal to nearly 28 per cent of its total stock and funded debt liability, and the fact that it was a subsidiary of a company by which its stock and securities were owned, and which also owned and financed other similar companies, made it reasonable to conclude that it was in a more favorable financial situation than if it were a disconnected enterprise.
 

 From a consideration of these authoritative decisions, it must be concluded that the rate of return allowed by the commission is fair and just and hence should not be disturbed.
 

 Upon the entire record we are of opinion that the findings and conclusion of the Public Utilities Commis
 
 *602
 
 sion of the state are neither unlawful nor unreasonable. Its order is therefore in all respects affirmed.
 

 Order affirmed.
 

 Weygandt, C. J., Stephenson, Williams, Matthias, Day and Zimmerman, JJ., concur.
 

 Jones, J., not participating.